FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO

2? AUG 13  PM 12: 57

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Judi B Atwood
    Plaintiff,

v,

Iskra L. Ivanova
    And

Clara A. Wilbrandt

  And

Edward C. Budd

COMPLAINT for a Civil Case

Civil No. _____

**DEMAND FOR JURY TRIAL**

**Defendants**

---

Plaintiff, Judi B Atwood hereinafter (the "Plaintiff') or ("Atwood'), for her Complaint against Defendants, Iskra L. Ivanova ("Ivanova"), Clara A. Wilbrandt ("Wilbrandt'), and Edward C. Budd ("Budd"), collectively hereinafter referred to as ("Defendants") alleges as follows:

## I.  **NATURE OF ACTION**

1. Plaintiff Judi B. Atwood respectfully submits this action against Defendant Iskra Ivanova, asserting that Defendant's actions were driven by malice and jealousy and were part of a calculated conspiracy to inflict severe emotional distress and irreparable harm upon Plaintiff.

2. Upon learning that Plaintiff had entered into a romantic relationship with William Beltz, Defendant Ivanova launched a deliberate and orchestrated campaign of harassment, defamation, and invasion of privacy, intending to dismantle and destroy Plaintiff's life. The consequences of Defendant's actions have been catastrophic, exacting a severe toll that has resulted in immeasurable suffering, profound and enduring emotional distress, significant medical issues, unrelenting torment, grievous personal injury, and the shattering of familial bonds with Plaintiff's children. Moreover, Plaintiff has suffered a devastating loss of livelihood and property, was forced to relinquish custody of her children, and has been subjected to public scorn, hatred, and merciless ridicule. Defendant's conduct, motivated solely by spite and an inability to accept Mr. Beltz's decision to move on, is not only morally reprehensible but also legally actionable. Plaintiff contends that Defendant's behavior constitutes intentional infliction of emotional distress, defamation, harassment, invasion of privacy, and a conspiracy to cause severe harm, all of which demonstrate pure malice.

3. In pursuing this legal action, Plaintiff Atwood seeks not only to hold the Defendants accountable for the deliberate and egregious harm they have perpetrated but also to vindicate her tarnished reputation. The Plaintiff's objective

is to unmask the calculated conspiracy and malevolent actions rooted in malice

and jealousy, executed by individuals in positions of trust who have grossly

abused their authority to further the vendetta of a spurned lover. This vendetta,

deceptively cloaked under the pretense of protecting a child—who tragically

sustained a traumatic brain injury due to being repeatedly dropped as an infant by

Ivanova—exemplifies a more insidious misuse of the legal system. It is

imperative that both the judiciary and the broader societal framework recognize

the covert manipulation and coercive influence wielded by vengeful former

partners like Defendant Ivanova, who exploit subjective language and emotional

appeals in courtrooms to distort the truth and weaponize jealousy. By making

false statements to the courts and court officers, Ivanova has caused significant

harm, undermining the principles of justice. Atwood seeks to demonstrate that,

like countless others who endeavor to rebuild their lives after moving on to new

relationships, she could not have reasonably anticipated the calculated malice and

deceptive tactics employed by Ivanova. This case underscores the urgent need for

vigilance against such manipulations within the judicial system.

4. Furthermore, Atwood seeks to hold accountable the deeply troubling involvement

of Clara Wilbrandt, an attorney practicing in Colorado, and Edward Budd, a

retired psychologist who practiced in Colorado. Both Wilbrandt and Budd played

a significant role in perpetuating the egregious mistreatment Atwood suffered at

the hands of Ivanova. Alarmingly, these individuals, who held positions of trust within the Boulder County Court, either actively supported or tacitly condoned Ivanova's malicious and jealous actions. Their conduct demonstrates a shocking disregard not only for the well-being of Atwood and her children but also for the ethical obligations inherent in their respective roles. The actions, or inactions, of Wilbrandt and Budd constitute a profound betrayal of the trust placed in them by the judiciary and the legal profession, raising serious concerns about the integrity of the judicial process and the protections it is supposed to afford to vulnerable individuals.

5. Budd and Wilbrandt's reprehensible conduct—whether through their direct complicity or willful indifference—further ensnared Atwood in a nightmare of relentless torment, amplifying Ivanova's malice, jealousy, and manipulative tactics. By allowing Ivanova's abuse to continue unchecked, Wilbrandt and Budd not only enabled her destructive behavior but also became active participants in the harassment, defamation, and invasion of privacy that sought to dismantle Plaintiff's life. Their actions brutally exacerbated the trauma inflicted upon Atwood, highlighting the critical need for collective accountability in confronting and eradicating the deeply disturbing practices of manipulation within the Boulder County Court community. It is imperative that the courts prioritize the use of objective language, adhere strictly to the Federal Rules of Evidence, and take

decisive steps to protect children and vulnerable individuals from the harmful actions of vindictive ex-partners.

## II. PARTIES

5. The Plaintiff Judi B. Atwood is an individual and citizen of Canada currently residing in the State of Colorado.

6. The Defendant Iskra L. Ivanova is an individual and citizen of the State of Colorado.

7. The Defendant Clara A. Wilbrandt is an individual and citizen of the State of Colorado.

8. The Defendant Edward C. Budd is an individual and citizen of the State of Colorado.

## III. JURISDICTION AND VENUE

9. Plaintiff brings this action pursuant to 42 U.S.C. § 1983, alleging violations of her civil rights by the above-captioned defendants. The claims include, but are not limited to, an attempt to mislead the court by a licensed attorney, which ultimately resulted in Plaintiff's prolonged loss of custody of her children, the shattering of familial bonds, intentional infliction of emotional distress, defamation, harassment, invasion of privacy, and conspiracy to cause severe harm—all of which were carried out with pure malice.

10. This Court has jurisdiction over this matter under 28 U.S.C. § 1331, as it

arises under federal law, specifically 42 U.S.C. § 1983. The amount in controversy exceeds $75,000, which does not fully represent the extent of the damages suffered by Plaintiff. Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b), as all the events alleged herein occurred within the State of Colorado, and all parties were residents of the State of Colorado at the time of the events giving rise to this action. Plaintiff sustained injuries in the State of Colorado as well as in the Country of Canada.

## IV.  GENERAL ALLEGATIONS

### DEFENDANT  IVANOVA

11. In 2013, Plaintiff Atwood entered into a new relationship following the dissolution of her marriage. At that time, she lived independently in her own apartment and had primary custody of her two daughters, maintaining a 67% custody arrangement. Occasionally, Plaintiff and her boyfriend would meet at a playground, allowing his son to play with her daughters, with whom he had developed a close bond. The son also enjoyed spending time with the Plaintiff. Plaintiff's boyfriend shares a child with Defendant Ivanova, whose relationship ended in 2012 after a violent incident in which Ivanova physically assaulted him while holding their infant son. Despite being the aggressor, Ivanova successfully manipulated law enforcement into believing she was the victim of domestic violence. However, during a subsequent interview with a Private

Investigator, Ivanova admitted, "She wanted him to treat her better. So, she hit him. She said that she figured it would get his attention. She didn't think there would be any repercussions. So, it was worth a try." Ivanova's hostility persisted as she took to social media to disparage Plaintiff's boyfriend, calling him derogatory names and even making threats to harm him, including threatening to decapitate him, after he refused to pay her electric bill following his wrongful arrest on domestic violence charges due to her false and fraudulent claims to the police. **Exhibit A**

12. Plaintiff's harassment and false allegations to decision makers in her domestic case began in 2015 by Ivanova. Defendant Ivanova engaged with Kevin Udis, a Parental Responsibility Evaluator assigned by the court to both Plaintiff's and Defendant Ivanova's Domestic Relation's cases. On July 15, 2015, at 10:01 p.m., Ivanova emailed Mr. Udis, falsely alleging that Plaintiff had called her derogatory names in front of her son and making statements such as, "I don't know anything about who she is or where they take my son." Ivanova further claimed, "For a year and a half, my son was interacting with a woman and her children, sleeping in his house, and I didn't know that." Contrary to these claims, Plaintiff was not residing in her boyfriend's home but was living independently and had no interaction with Ivanova. Furthermore, Ivanova would have had no way of knowing if Plaintiff had called her derogatory names—an allegation that Plaintiff unequivocally denies.

13. On January 13, 2016 at 5:42 am Ivanova sent an email to Plaintiff's boyfriend,

in which she referenced a conversation with the minor child, stating, "He wants me to meet 'Bad Puppy.'" She then added, "I believe your girlfriend." In the very next sentence, however, Ivanova abruptly shifted the tone by stating, "When I talk with you, no one around me will even ever think that I am talking with my ex."

This communication is deeply perplexing and indicative of Ivanova's erratic behavior, as it conflates the child's innocent desire to meet Plaintiff with Ivanova's inexplicable assertion about her own interactions with Plaintiff's boyfriend. The juxtaposition of these statements reveals an attempt by Ivanova to manipulate and control the narrative, suggesting an unstable and bizarre fixation on both the Plaintiff and her relationship with Ivanova's former partner. Such behavior is not only inconsistent and irrational but also illustrates a troubling pattern of emotional manipulation, warranting scrutiny by the federal court.

14. On January 16, 2016, at 10:35 PM, Ivanova sent another email to Plaintiff's boyfriend, stating, "I do not care about you and your girlfriend. I care that W is between the two of you, and he is telling me that Bad Puppy is mean to daddy all the time." She further remarked, "Obviously, W is hurt by this situation. If this woman doesn't respect you, then I will have to talk with her as a mom, as her behavior affects my son."

This email is both harassing and threatening in nature. Ivanova's message not only intrudes upon the private relationship between Plaintiff and her boyfriend but also uses the child as a means to exert control and influence over the situation. Her statements

imply an unfounded authority over Plaintiff by suggesting that she has the right to intervene and address Plaintiff's behavior directly, despite having no legal or personal standing to do so. Ivanova's assertion that she "will have to talk with her as a mom" is particularly troubling, as it carries an implicit threat of confrontation, further escalating tensions. This behavior is emblematic of harassment, as it seeks to intimidate and manipulate, rather than protect the well-being of the child.

15. On January 18, 2016, at 7:46 AM, Plaintiff's boyfriend received an email from Ivanova, stating, "I can only imagine what kind of person is someone called 'Bad Puppy.' I understand that it is very easy for you to have B and A playing with W. Instead of finding friends, as was the case during W's birthday—you probably weren't with her, and for that reason, you didn't celebrate W's birthday."

This email is particularly alarming and distressing for Plaintiff because Ivanova repeatedly mentions Plaintiff's children, B and A, in a manner that is both intrusive and suggestive of an inappropriate preoccupation with them. Ivanova's references to the children, coupled with her insinuations about Plaintiff's parenting and involvement in her children's lives, are designed to provoke fear and anxiety in Plaintiff. By questioning Plaintiff's character and implying that her presence is detrimental to her children's social interactions, Ivanova not only undermines Plaintiff's role as a mother but also seeks to create doubt and guilt in her mind. This behavior is calculated to cause emotional distress, as it subtly threatens the stability of Plaintiff's relationship with her children and

raises concerns about their safety and well-being in the context of Ivanova's intrusive and harassing behavior.

16. Plaintiff's ordeal commenced when she became the target of multiple criminal acts, rendering her terrified to reside alone in her own home. In 2016, driven by fear for her safety and that of her children, Plaintiff relocated to the residence of Ivanova's former boyfriend. During this period, Plaintiff was repeatedly awakened by the realization that Ivanova had become aware of her living arrangement with Ivanova's ex-boyfriend. The harassment began as Ivanova persistently demanded to meet Plaintiff through a barrage of text messages directed at her ex-boyfriend. These messages escalated into threats, including demands for money, derogatory remarks about the United States and its citizens, and even menacing statements about Russian invasions on U.S. soil. Ivanova's actions marked the onset of a calculated and malicious campaign of harassment and intimidation against Plaintiff, fueled by envy and spite.

17. On April 27, 2016, just days after Plaintiff's car was stolen, her apartment was broken into, and she was robbed, Defendant Ivanova sent an email to Plaintiff's court-appointed Parenting Coordinator/Decision-Maker (PCDM). In this email, Ivanova stated: "I have also requested to know the name of Bill's girlfriend with whom my son spends his time. This was denied. W is making comments that 'Bad Puppy' (Plaintiff's endearing nickname given by the minor child) has been mean to dad and that she screams a lot. I am very concerned about the scenes W might witness. She does know

my name, and I was told that she has sent a message to me through social media."

Ivanova's allegations are baseless and misleading, creating the impression of and alarming situation that does not exist while Plaintiff is dealing with an extremely difficult situation.   It is as though Ivanova is describing someone else entirely, all while monitoring Plaintiff's social media activities. Plaintiff did, in fact, send a single message through social media to identify herself to Defendant in an effort to stop the derogatory and defamatory statements Ivanova was making to court officials. Ivanova's claims are false and part of a broader campaign of harassment and misinformation designed to malign Plaintiff's character.

18. On June 13, 2016, Ivanova sent another troubling email to Plaintiff's attorney and Karen Lamprey, stating, "W needs to be able to collect as much as possible insights and confidence for himself to be able to be a healthy adult individual. This craziness of not seeing his family in Bulgaria but instead sleeping in the same bed with his dad and his girlfriend is just ridiculous."

The seriousness of Ivanova's statements lies in her direct communication with third parties, including Plaintiff's attorney, which is highly concerning for several reasons. First, Ivanova's  email not only questions the parenting decisions of Plaintiff's boyfriend but also suggests inappropriate conduct by implying that the living arrangements are detrimental to the child's development. This unfounded accusation, made to third parties, could have serious legal implications, potentially affecting custody

arrangements and the court's perception of the parenting environment.

Second, by framing her statements in this manner, Ivanova is attempting to cast doubt on the moral and psychological well-being of the child under Plaintiff's home, which could severely damage Plaintiff's legal standing and reputation. The deliberate mention of "craziness" and "ridiculous" living conditions is clearly intended to provoke concern and alarm among the recipients, further exacerbating the emotional distress already endured by Plaintiff. Such statements, made to influential third parties, raise significant concerns about Ivanova's intentions and the potential harm they could cause to Plaintiff's legal and personal affairs.

19. On July 21, 2016, Ivanova sent yet another email to Plaintiff's boyfriend, stating, "He and a friend of his were talking—she about her abusive father and he about your girlfriend, how she gets angry, showing with her face a monster expression."

The context of this email is deeply concerning, especially considering it is part of a series of similar communications from Ivanova. This message attempts to portray Plaintiff in an extremely negative light, implying that she exhibits abusive and frightening behavior akin to that of a "monster." Such statements are highly problematic when made to a third party, as they seek to manipulate perceptions and cast Plaintiff as a harmful influence on those around her, particularly her boyfriend's child.

The fact that Ivanova draws a parallel between Plaintiff and an abusive father further exacerbates the seriousness of this email. It suggests a deliberate effort to equate

Plaintiff's behavior with that of an abuser, which could have significant ramifications in any legal proceedings, particularly those involving child custody or character assessments. By conveying such damaging and unfounded assertions, Ivanova's communications not only risk undermining Plaintiff's reputation but also seek to inflict emotional distress and create discord within Plaintiff's personal relationships. This pattern of behavior demonstrates a calculated attempt to harm Plaintiff's standing, both legally and personally, which is of serious concern to any court evaluating the broader context of these communications.

20. In October of 2016 Plaintiff lost custody of her children based on the theory of Parental Alienation. Parental alienation is a theory that suggests one parent can manipulate a child into unjustly rejecting the other parent, often during high-conflict custody disputes. Originating in the 1980s through the work of psychiatrist Richard Gardner, this concept posits that the "alienating" parent uses psychological tactics to create an unwarranted estrangement between the child and the "targeted" parent. This theory gained traction in family courts, particularly through the influence of Attorney's when claims of child abuse have been made against a party, ironically it is the Plaintiff's ex husband's behavior that has always been investigated with CPS not the Plaintiff, which has been readily endorsed its use in custody evaluations, up until a few years ago after Colorado endured several public investigations regarding the lack of professionalism of Parental Responsibility Investigators.

13

As a result, courts began to remove children from the care of parents accused of alienation, often without fully considering the child's expressed fears or preferences. This application has been widely criticized for its potential to misinterpret genuine concerns, such as instances of abuse, as mere manifestations of alienation, leading to harmful judicial outcomes.

In recent years, the theory of parental alienation has been increasingly discredited by international bodies, including the United Nations. The UN has raised concerns about the misuse of parental alienation in legal proceedings, highlighting its potential to silence children and dismiss valid allegations of abuse. The UN Committee on the Rights of the Child has emphasized the importance of listening to children's voices in judicial matters and has criticized the application of parental alienation for contradicting these principles by presuming children's rejection of a parent to be the result of manipulation rather than a legitimate response to that parent's behavior. The United Nations' stance underscores the need for courts to approach custody disputes with a focus on safeguarding children's rights and well-being, rather than relying on controversial and unproven theories like parental alienation.

21. On January 10, 2017, Plaintiff succumbed to the overwhelming toxic stress, driven by the constant fear that neither she nor her children were safe from Defendant Ivanova. This fear, which was exacerbated by the events surrounding a court hearing regarding the custody of her children, culminated in a seizure suffered by Plaintiff in the

14

Boulder County Courthouse. The immense strain of her litigation, marked by continuous harassment and intimidation by Ivanova, had taken a severe toll on her health. Throughout her own painful legal battle, Plaintiff's health deteriorated significantly, leading to multiple hospitalizations due to the effects of toxic stress. This stress was primarily induced by her high-conflict divorce, and the pervasive threat posed by Ivanova, which left Plaintiff unable to feel secure in her own home or confident in her ability to protect her children. Ultimately, the unrelenting anxiety and stress inflicted on Plaintiff by these events resulted in damage to her health, a tragic outcome of the toxic environment she was forced to endure.

22. On Monday, August 14, 2017, Defendant Ivanova sent an email to a Parenting Coordinator/Decision-Maker (PCDM) who was not working with Plaintiff, but was instead engaged solely with Plaintiff's boyfriend and Defendant Ivanova. The email stated: "Bill, please believe me that when W shares things with me on the phone about 'Bad Puppy' Judi Atwood 'changing everything in the house,' I do not seek details nor request further information; I only want W to be safe and to feel comfortable sharing even such small details with me, as part of building a trustful relationship. I believe this was previously discussed with you by Attorney Karen Lamprey: if W feels the need to share with me, he must feel secure in doing so. He must grow with the conviction that his mother is a 'safe person' to confide in. It seems to me that he is not being allowed to do so."

This email is deeply troubling as it illustrates Ivanova's ongoing attempts to sow discord and manipulate the perceptions of those involved in the custody and care of the minor child. By implying that Plaintiff is preventing the child from communicating freely and safely with his mother, Ivanova is attempting to undermine Plaintiff's relationship with the child and her boyfriend and cast doubt on her suitability because she is living in the home with her son. Moreover, the fact that this communication was directed to a PCDM not associated with Plaintiff underscores Ivanova's intent to influence third-party professionals in a manner that could adversely affect Plaintiff's living situation and housing stability and Plaintiff's character. Such actions are indicative of a deliberate strategy to attention away from Ivanova and put the attention on the Plaintiff and to manipulate the judicial and mediation processes to her advantage in her civil matter. Ivanova has repeatedly asked and begged Plaintiff's boyfriend for money while at the same time she insults him and American Culture.

23. On August 22, 2017, Defendant Ivanova inexplicably accessed and transmitted Plaintiff Atwood's court files to PCDM Craig Eades. This action is deeply concerning as access to court files is typically restricted to parties directly involved in the case or their legal representatives. The unauthorized access and distribution of these files raise significant legal and ethical questions about how Defendant Ivanova obtained these documents and for what purpose. This breach of confidentiality not only undermines the integrity of the judicial process but also suggests a deliberate attempt by Defendant to

interfere with and influence ongoing legal proceedings to Plaintiff's detriment. In addition this invasion of privacy suggests that the Defendant is deeply fixated on finding out everything on Plaintiff and has been fixated and deeply concerning. Such conduct is alarming and warrants serious scrutiny by this Court.

24. On January 20, 2018 at 11:36 PM, Defendant Ivanova sent another email to multiple individuals, including Julie Borja, Plaintiff's boyfriend, and PCDM Craig Eades. In the email, Ivanova stated, "I would like to address another issue—W is under a lot of pressure. He is growing, learning new skills, and has to navigate the complexities of the adults in his life. He is sad that he doesn't see B and A. He also mentioned that I have been mean to 'Bad Puppy.' It took him 24 hours to calm down and finally hear me out—that I have never met daddy's girlfriend, never seen her, etc. He reminded me that we once talked on the phone, perhaps when he asked his dad if he could talk to 'Bad Puppy.' I don't remember that, but he said so. I did talk with his grandmother this way. I also reminded him that when I didn't want some nail polish, he said he would give it to 'Bad Puppy,' and so he did. At the end, he stated: 'Daddy is stupid.' If W feels immersed in an emotional swing, on top of his doubts about his ability to read and pronounce words, dealing with the emotional baggage of the adults in his life becomes overwhelming. The best for him would be not to be involved in any relationship between 'Bad Puppy' and me. He has enough to deal with hearing about 'Bad Dad,' who doesn't let B and A be with their mom. W really misses them, and that is

a huge disappointment for him; he feels completely disempowered."

This email is deeply disturbing for several reasons. First, Ivanova's repeated mention of Plaintiff's children, B and A, and her unsolicited commentary on their relationship with their mother, suggests an ongoing preoccupation with Plaintiff's personal life. Ivanova continues to discuss Plaintiff in a manner that appears to undermine Plaintiff's role as a mother. Ivanova's attempt to insert herself into the dynamics of Plaintiff's family, despite having no direct connection to Plaintiff, raises serious concerns about her intentions and the potential harm caused by her statements. This conduct not only exacerbates the emotional distress experienced by the Plaintiff but also demonstrates a pattern of inappropriate and intrusive behavior that warrants careful scrutiny that was clearly ignored in Defendant Edward Budd's Report to Boulder County District Court.

Furthermore, Ivanova's references to Plaintiff's boyfriend, particularly her comments about "Bad Puppy" being "mean with daddy the whole time" and "daddy is stupid," are equally concerning. These statements suggest that Ivanova is using the child to convey negative sentiments about Plaintiff's boyfriend, further exacerbating the situation. The fact that Ivanova, who admits to having never met Plaintiff, feels compelled to make such comments about the Plaintiff's boyfriend is indicative of a deeper and more troubling attempt to manipulate and interfere with the Plaintiff's personal and family life.

This conduct not only exacerbates the emotional distress experienced by the Plaintiff but also demonstrates a pattern of inappropriate and intrusive behavior that warrants immediate scrutiny. The fact that Ivanova repeatedly engages in such behavior, particularly in a context that involves children, is alarming and raises serious concerns about her motivations and intentions. It is evident that Ivanova's actions have caused significant emotional harm to the Plaintiff and have undermined her ability to rebuild her life in the aftermath of her custody loss. Ivanova's lack of empathy and ability to gauge her personal attack's on Plaintiff and exploit her during personal tragedy and loss demonstrate that Ivanova has a great deal of intel on Plaintiff and maliciously times her personal attacks.

25. On March 3, 2018, Ivanova sent a troubling email to Plaintiff's boyfriend, Craig Eades, and Julie Borja. The email reads: "At the doctor's office, W was telling me that I need to go to Mommy's school (we are always talking about how he is making me a better person). He said that there they will beat me and throw me in a bag into the trash. He also mentioned that he doesn't see B and A anymore. It seems that Bad Puppy's —Judi Atwood's—frustration about her loss has a deep effect on him, and of course, he misses his friends."

This communication is deeply disturbing as it reveals Ivanova's growing fixation on the Plaintiff, her children, and her relationship with her boyfriend. Ivanova's attempt to manipulate the narrative by inserting subjective and inflammatory language, such as

attributing W's distress to Plaintiff's supposed frustration, highlights a concerning pattern. This type of subjective language is often weaponized in custody disputes, unfairly influencing decisions by courts that are intended to be impartial and focused on the best interests of the children.

Ivanova's repeated references to Plaintiff's children and her insinuations about Plaintiff's emotional state are not only invasive but also potentially damaging. Such statements can create a biased portrayal of the Plaintiff in the eyes of the court, leading to unjust outcomes that harm families rather than protect them. The persistence of these disturbing emails underscores the need for the court to scrutinize Ivanova's motives and the potential impact of her communications on the judicial process. Ivanova's disturbing fixation with Plaintiff, coupled with her use of inflammatory language and insinuations, has a potentially damaging effect on custody decisions, leading to biased judgments that can unjustly harm families and undermine the integrity of the courts.

26. On June 22, 2018, at 8:50 a.m., Defendant Ivanova sent an email to Plaintiff's boyfriend and Craig Eades, the Parental Coordinator/Decision Maker (PCDM) for Boulder Case 2012DR22, stating, "I have no schedule for W for last week and no answer about B and A. I can wait." This email was sent following a text message to Plaintiff's boyfriend in which Ivanova insisted that Plaintiff's children be delivered to her home in Denver.

This communication is particularly alarming when viewed in the context of

Ivanova's ongoing behavior and the broader situation. Ivanova, who has no legal or custodial relationship with Plaintiff's children, is displaying an unhealthy obsession with controlling their interactions and schedules. Her repeated inquiries about the children's whereabouts, coupled with her insistence on having them brought to her home, suggest an inappropriate level of interest in the children's lives.

The fact that Ivanova feels entitled to dictate terms regarding Plaintiff's children is concerning, especially since she has no legal standing in their custody or upbringing. This email, along with the others, reflects a broader pattern of manipulative and controlling behavior that Ivanova has exhibited throughout her communications. Her fixation on Plaintiff and her children, despite having no legitimate reason to be involved, raises serious concerns about her intentions and the potential impact on the well-being of both the children and Plaintiff.

Moreover, the involvement of a PCDM, who is supposed to act as an impartial facilitator in high-conflict custody disputes, makes this situation even more troubling. The PCDM's role is to ensure that the best interests of the children are being served and that the legal process is conducted fairly and impartially. However, Ivanova's actions suggest that she is attempting to use the PCDM's position to further her own agenda, which undermines the integrity of the judicial process.

The repeated and unsolicited references to Plaintiff's children in Ivanova's emails, combined with her clear intent to insert herself into their lives, constitute a serious

invasion of privacy and   an attempt to disrupt the family's dynamics. This   ongoing

behavior has undoubtedly caused significant emotional distress to the Plaintiff, who is

already dealing with the challenges of a contentious custody situation. The district court

refused to take these actions into consideration and ensure that Ivanova's manipulative

and invasive behavior is addressed to protect the Plaintiff and her children from further

harm.

27. The responsibilities of District Courts and Parental Coordinators/Decision

Makers (PCDMs)  are crucial in maintaining the integrity and impartiality of family law

proceedings, with a focus on the children's best interests. District Courts ensure that

justice is administered fairly, while PCDMs serve as neutral facilitators, helping to

mediate disputes, facilitate communication  between parents, and make decisions that

prioritize the welfare of the children involved.  The role of a PCDM is particularly

important in high-conflict custody disputes, where their impartiality is meant to diffuse

tensions and support the well-being of the children.

However, an email sent by Ivanova on June 22, 2018, to Plaintiff's boyfriend and

PCDM Craig Eades raises serious concerns about the misuse of these roles. The email

reads:

"You need to explain to W that B and A will not drive to Denver. The second option is

still valid: You can come to pick him up, have playtime and bring him back. More

telephone conversations with W about B and A and he stating to stay  one more week

22

with you so he can see them is going to be documented describing how you handled the situation and your role in that. I hope you understand I am doing this for W not for B and A."

In this communication, Ivanova seems to be exerting control over the interactions between W and Plaintiff's children, B and A, in a manner that is manipulative and controlling. Her statement that further conversations will be documented, coupled with the claim that her actions are solely for W's benefit, raises concerns about her attempt to influence the PCDM's view of the situation. This is particularly troubling because it suggests that Ivanova is using the role of the PCDM, who is supposed to remain impartial, as a tool to manipulate the process rather than focusing on the children's best interests.

This situation is profoundly distressing for the Plaintiff, as the email not only invades her personal life but also manipulates the relationships her children have with others, exacerbating her emotional suffering. The repeated mentions of her children, combined with the controlling tone of the email, add to the Plaintiff's anxiety and feelings of helplessness. This ongoing behavior, particularly when involving a court-appointed official like a PCDM, significantly intensifies the emotional and psychological strain on the Plaintiff, who is already grappling with the painful reality of her custody situation. Such actions highlight a disturbing trend where manipulators exploit the District Courts as platforms for punitive measures, orchestrating campaigns

of harassment, defamation, and invasion of privacy, with the intent to dismantle and destroy the lives of those they target. In this case, the Plaintiff is subjected to an ongoing campaign designed to instill fear and invade her privacy. This behavior should be actively discouraged and documented by Defendant Edward Budd in his report for the District Courts, yet it appears to be endorsed instead, which undermines the very principles of fairness and justice that the legal system is intended to uphold.

28.  The coordinated actions of exploiting Plaintiff's personal matters suppressed in her High Conflict Divorce from Defendant's Wilbrandt, and Ivanova reveal a disturbing pattern of collusion aimed at inflicting significant harm not only on the Plaintiff but also on her boyfriend. These actions are not only unethical but demonstrate a concerted effort to manipulate legal proceedings to the detriment of the Plaintiff, this problematic conduct that should shock the conscience of court-appointed PRE's, with particularly with respect to the conduct of ex's is often overlooked to create a equitable outcome.

During this time, Plaintiff's opposing counsel in her civil case, Rebecca Pepin, has admitted to communicating with Ivanova and Wilbrandt. This is particularly concerning due to the consistent harm that Plaintiff has suffered, harm that the District Court is keenly unaware of structural problems regarding the problematic behavior of professionals in regards to family law cases.  Plaintiff has endured actions by attorney's using derogatory characterization of Plaintiff as a "cyber terrorist" in communications

with other attorney's, this ongoing pattern of bullying in civil cases, and the submission of false statements to the court seems to be creating a symbiotic relationship between Judicial Officers and Attorneys whereas Judicial Officers often don't have time to look for problems and Attorney's like Wilbrnadt leverage their court-appointed professionals for personal gain.  The Defendants clearly created a laissez-faire while misleading the Judicial Officer's involved in 2012DR22.

The involvement of Defendants Wilbrandt and Ivanova in this collusion further exacerbates the ethical breaches at play. Their collaboration with Rebecca Pepin a partner at Jorgenson, Brownell and Pepin particularly given the fact that Pepin's law firm represented Plaintiff's boyfriend shortly after she began colluding with the Defendants, raises serious ethical concerns.  **Exhibit B**. Defendant Wilbrandt, as an attorney, should be well aware that under Colo. RPC 4.5(a), a presumptive sanction of suspension is warranted under ABA Standard 7.2 when a lawyer knowingly engages in conduct that violates professional duties, resulting in injury or potential injury to the public or the legal system. Additionally, ABA Standard 6.32 mandates a presumptive sanction of suspension for violations of Colo. RPC 4.2, which applies when a lawyer improperly communicates with an individual involved in the legal system,  causing injury or potential injury to a party or interfering with the outcome of the legal proceeding.

The Boulder County Court's repeated failure to address these blatant violations

highlights the urgent need for federal intervention to uphold the principles of fairness and justice, ensuring that those engaging in unethical conduct are held accountable. Plaintiff, who is trained in Judicial Performance and has volunteered in this capacity, is acutely aware of the meticulous efforts by the Office of Judicial Excellence and Performance. Colorado is recognized for having some of the best judges in the country. However, it is clear that Judicial Officer's rely heavily on PRE and other experts whom have a reputation in Colorado to ignore problems. Our judicial culture is the product of crushing caseloads, sparse resources and a shallow pool of PRE's willing to take the most challenging cases.

29. In January 2021, Defendant Ivanova met with Plaintiff's ex-husband in a park, during which they exchanged information. Already aware of the collusion and its damaging consequences, as well as the lack of due process protections by the courts against such behavior, Plaintiff was deeply alarmed. The continual intrusions into her personal life by Ivanova, coupled with the escalating fear for her safety, led Plaintiff to make the drastic decision to flee to Canada.

Terrified and traumatized, Plaintiff set out for the Canadian border, believing that she could no longer be safe within the Boulder County Courts. The journey took over four days during winter, where she braved treacherous conditions, seeking refuge in domestic violence shelters along the way. Completely indigent and unable to afford legal representation in her civil matter let alone the protection she needed from Defendant

Ivanova—Plaintiff reached out to the Canadian Embassy for assistance. The embassy responded by meeting her at the border, securing her re-entry into her country of citizenship the following day.

This harrowing experience, fueled by toxic stress and the severe impact on Plaintiff's mental and physical health, forced her to sever ties and her bond with her children. The Canadian authorities escorted Plaintiff to a COVID isolation facility, cutting off her access to communication with the United States, including her children and boyfriend. This tragic outcome exacerbated by Ivanova's relentless invasion of privacy, defamation within the community, and threats against Plaintiff's children left Plaintiff feeling utterly abandoned by the District Courts. Believing she had no other option to safeguard her well-being, Plaintiff took matters into her own hands, demonstrating the severe psychological toll that Ivanova's actions had inflicted.

30. Plaintiff found it impossible to return to the United States from Canada, where her health had improved, albeit temporarily, due to the absence of hospital visits and the freedom to walk and feel safe. During this period, Plaintiff's boyfriend noted that Defendant Ivanova had not sent any texts or emails concerning Plaintiff for several months. Despite experiencing some relief, Plaintiff incurred substantial expenses in Canada and desperately missed her children and boyfriend.

In late July, Plaintiff received a distressing phone call from her youngest daughter, R.P., who reported that she had been abandoned in California by Plaintiff's abusive ex-

husband. R.P. explained that they were stranded at the airport with their troubled live-in caregiver, and that they had no money, were scared, and had been left without communication from their father. The caregiver, who had a concerning past, had just had an explosive altercation with Plaintiff's ex-husband.

Plaintiff, fearing for the safety and well-being of her children, was able to secure financial resources from her boyfriend to help them out of the crisis. Recognizing the precarious situation, Plaintiff resolved that it was time to return to Colorado. Despite her fears and the knowledge that Ivanova would effectually find out, Plaintiff was determined to ensure that her children would be taken care of.

31.  Months after Plaintiff returned home, she refrained from informing family and friends of her return due to concerns that Ivanova would discover her presence and resume her harassment. Indeed, after learning of Plaintiff's return, Ivanova proceeded to fabricate allegations, claiming that Plaintiff had made multiple calls to her from a private number, including a call where Plaintiff allegedly said, "William is Gay." Ivanova tried to manipulated PRE Edward Budd into believing these baseless allegations.

However, Ivanova's evidence fails to meet the rigorous standards required for the admissibility of telephone calls in federal court, standards which are equally applicable in district courts.  According to Rule 901 of the Federal Rules of Evidence, any evidence must be authenticated, meaning that the party offering it must produce sufficient proof that the item is what they claim it to be. Specifically, Rule 901(b)(6) addresses the

authentication of telephone calls, requiring evidence that the call was made to the correct number assigned to the intended recipient, and that circumstances, such as self-identification, confirm the identity of the person answering.

Additionally, telephone conversations often involve statements that could be considered hearsay. Under Rules 801-807, hearsay is generally inadmissible unless it falls under a specific exception, such as those listed in Rule 803, which includes present sense impressions or excited utterances. Furthermore, the Best Evidence Rule (Rule 1002) requires the original recording of a call to be produced if the content is disputed, with few exceptions. Relevance is also crucial; under Rule 401, the call must be pertinent to the case, making a fact of consequence more or less probable. Even relevant calls may be excluded under Rule 403 if their probative value is outweighed by the risk of unfair prejudice, confusion, or undue delay.

Despite these stringent requirements, Ivanova and Wilbrandt colluded to present false and unverified evidence, knowing it would likely deceive the PRE into accepting their fabrications. They exploited the lack of proper authentication and the absence of a court order, and despite the Plaintiff not being a party to the case, the false narrative was accepted. Ivanova's own email admission that she had never met or spoken to the Plaintiff further discredits her claims, yet both she and Wilbrandt knew how to manipulate the situation to unfairly punish the Plaintiff.

32. On December 22, 2021, Defendant Ivanova met with Plaintiff's ex-husband at

Children's Hospital in Denver. During this encounter, Ivanova took the troubling step of approaching Plaintiff's children directly. Given the ongoing harassment and manipulative tactics previously employed by Ivanova, this action represented a clear escalation in her campaign of interference and intimidation. Recognizing the seriousness of this conduct, Plaintiff took immediate legal action. On December 31, 2021, Ivanova was formally served with a Cease and Desist order by Denver Boulder Couriers, as documented in **Exhibit C**. This legal measure was an effort to protect Plaintiff's children from further unwarranted and invasive actions by Ivanova, emphasizing the necessity of legal intervention to halt such disturbing behavior. In addition months prior Plaintiff attempted to address the child abuse claims against her not reported to State Agencies but to 3rd parties by Ivanova. Plaintiff informed Ivanova's employer that in Colorado, teachers are considered mandatory reporters under state law (C.R.S. § 19-3-304). This means they are legally required to report any suspected child abuse or neglect. If a teacher has "reasonable cause" to suspect that a child is being abused or neglected, they must report it immediately to the appropriate authorities, such as local law enforcement, the county department of human services, or the Colorado Child Abuse and Neglect Hotline. Plaintiff whom is an contractor with CDHS confirms that Ivanova never reported any suspected child abuse but used it to make harassing statements and to destroy Plaintiff's character.

33. Despite being served with a Cease and Desist order, Defendant Ivanova

continued her pattern of harassment with little regard for its legal implications. She persisted in manipulating the Parental Responsibility Evaluator (PRE) and spreading false statements about the Plaintiff within the community.  On Thursday, April 18, 2024 at 09:03:55 PM MDT emailed Lyuben Ivanov her father whom she severed all ties with and stated "I am afraid for William. I reported to the court that William had shared with me that his dad's girlfriend interacts with him even though the court prohibited it until she takes the psychological evaluation. Yesterday was your birthday. Could you please call him and talk with him? He would have a person outside calling him. Thank you. " Ivanova's disregard for the cease and desist order underscores her ongoing and deliberate efforts to undermine Plaintiff's reputation and well-being, further exacerbating the harm already inflicted. The statement suggests that Ivanova's actions are part of a broader pattern of behavior aimed at undermining the Plaintiff's reputation and well-being.  Plaintiff has spent many hours and overnight's at Lyuben Ivanov's home prior to the Defendant's collusion to destroy her life and character.

<u>DEFENDANT BUDD</u>

34. On August 23, 2021, Defendant Ivanova and Plaintiff's boyfriend were court-ordered by the Boulder District Courts to engage in a Parental Responsibility Evaluation (PRE). On November 23, 2021, Plaintiff's boyfriend received an unexpected call from Cameron Budd, the son of Edward Budd, who was serving as the PRE in this case. It is noteworthy that Cameron Budd is neither an employee of Edward Budd nor associated

with his professional practice; instead, he is employed as a clerk by a law firm and does not hold any official role in the psychological services provided by Edward Budd. Defendant Ivanova interacted with Cameron Budd repeatedly pertaining to the Plaintiff.

Given the sensitive nature of the work that Edward Budd is entrusted with, including conducting thorough and impartial investigations, it is deeply concerning that his family members, particularly those not formally associated with his practice, would be involved in the inquiry process. Cameron Budd's call to Plaintiff's boyfriend, in which he inquired about who resides in the home, raises significant ethical and procedural issues. Such involvement of a non-professional family member in the investigative process could compromise the integrity of the evaluation and lead to a breach of confidentiality and impartiality, essential components in psychological assessments and court-related evaluations.

35.  On December 8, 2021, PRE Edward Budd insisted that Plaintiff's boyfriend host a dinner for him at Plaintiff's home, which is deeply troubling and raises serious ethical concerns under the American Psychological Association (APA) guidelines. The APA's Ethical Principles of Psychologists and Code of Conduct strictly prohibit any behavior that could compromise professional boundaries or create a conflict of interest. Specifically, engaging in social activities, such as a private dinner at a client's home, may blur the lines between professional and personal relationships, undermining the objectivity and impartiality required in a Parental  Responsibility Evaluation (PRE).

During the dinner, while Plaintiff was preparing food, Dr. Budd engaged with Plaintiff's boyfriend and his son. When the group sat down to eat, Dr. Budd appeared confused about where to sit and, in a concerning display of inappropriate conduct, remarked, "A gentleman waits for the lady to sit first, but I guess there are no gentlemen here tonight." This comment, which carries an undertone of judgment and disrespect, is highly unprofessional and reflects a breach of the APA's ethical standards that require psychologists to maintain decorum, respect, and professionalism at all times. APA requires Psychologist to not engage in behavior risks impairing the psychologist's objectivity, competence, and effectiveness, which is critical in a PRE. APA also requires that Psychologist maintain respect and professionalism at all times.

Such behavior not only compromises the integrity of the evaluation process but also could be construed as an attempt to influence the dynamics within the family being evaluated. This incident highlights a serious departure from the ethical standards that govern the conduct of psychologists and underscores the need for scrutiny and accountability in the handling of sensitive family law matters.

36. On December 20, 2021, Plaintiff received a voicemail from Cameron Budd, the son of Dr. Edward Budd, instructing her to appear at Dr. Budd's office within 24 hours for psychological  testing. This directive was deeply troubling for several reasons. Firstly, Plaintiff was not a party to the case under Dr. Budd's evaluation, and there were no court orders mandating her participation in any psychological assessment. Secondly,

the involvement of Cameron Budd, who is not an employee of Dr. Budd's practice, in communicating such directives to Plaintiff raises significant concerns regarding violations of privacy and confidentiality, as required under the Health Insurance Portability and Accountability Act (HIPAA). HIPAA mandates that only authorized individuals can access and communicate sensitive medical information, and the use of a non-employee for such communications could constitute a breach of these regulations.

Additionally, Plaintiff had already been subjected to inappropriate and unsettling behavior by Dr. Budd during a prior dinner meeting, where boundaries were crossed and ethical standards compromised. Given these circumstances, Plaintiff was understandably distressed and felt compelled to protect herself from further inappropriate conduct. Consequently, on December 23, 2024, Plaintiff sent a certified Cease and Desist letter to Dr. Budd, formally requesting an end to any further unauthorized contact and emphasizing her non-involvement in the case which Budd did not include in his report to Boulder County District Court. This action was necessary to safeguard Plaintiff's rights and well-being in the face of continued unethical behavior. **Exhibit D**

37. Dr. Budd's inclusion of the Plaintiff in the Parental Responsibilities Evaluation (PRE) report for Boulder County Case 2012DR22, without a court order, Plaintiff's consent, or any designation of the Plaintiff as a caregiver, directly infringes upon Plaintiff's rights under the Fourteenth Amendment.

The Fourteenth Amendment extends these due process protections to actions by

state and local governments, including entities and individuals acting under the authority of state courts, such as a PRE. The inclusion of Plaintiff in the PRE report without her consent or a court order deprived her of her right to procedural due process, meaning she was not given a fair chance to contest her involvement in the evaluation or to protect her personal information from being included in legal proceedings.

Furthermore, the Plaintiff's right to privacy, an extension of the liberty protections found in the Due Process Clauses of the Fourteenth Amendment, was also violated. The Supreme Court has recognized that individuals have a constitutional right to privacy, which includes the right to control personal information and to be free from unwarranted public exposure. By including Plaintiff's information in the PRE report without legal authority, Dr. Budd disregarded these protections, infringing upon her constitutionally protected rights.

This situation highlights a failure to respect the procedural safeguards that the Fourteenth Amendment are designed to uphold, specifically the rights to due process and privacy.

38. Dr. Budd accessed Plaintiff's prior Parental Responsibilities Evaluations (PREs) from Boulder County Court, which raises significant legal and ethical concerns. The report prepared by Dr. Budd incorporated language that appears to have been heavily influenced by the narrative provided by Plaintiff's abusive ex-husband, rather than based on an independent, objective psychological assessment. This reliance on non-

medical, non-science and subjective information is particularly troubling, especially given that the records in question were sealed and thus legally protected from unauthorized access.

In Colorado, the standard for psychological evaluations is governed by strict ethical guidelines and legal standards. According to the American Psychological Association (APA) and Colorado state law, psychological reports must be current and relevant to the individual's present circumstances. The use of outdated psychological evaluations—especially those more than eight years old—is generally considered inappropriate and fails to meet the standard of care expected in psychological assessments.

Moreover, accessing sealed court documents without explicit permission from the court constitutes a serious violation of both legal and ethical standards. Colorado law mandates that sealed records are to remain confidential and can only be accessed by parties with a direct and legitimate interest, and only with the court's approval. This ensures that sensitive information, particularly from psychological evaluations, is protected from unauthorized use and disclosure.

The unauthorized use of psychological reports without the consent of the individual involved also contravenes Colorado's privacy laws and ethical standards for psychologists. Such actions not only breach confidentiality but also violate the individual's right to privacy under the Colorado Constitution, which is further protected

under both the Fifth and Fourteenth Amendments to the United States Constitution. These amendments guarantee due process rights, including the right to be free from unwarranted intrusion into one's personal and psychological records.

In Colorado, the standards governing psychological evaluations are shaped by both ethical guidelines from the American Psychological Association (APA) and specific state laws.

### APA Ethical Guidelines

The APA's Ethical Principles of Psychologists and Code of Conduct provide clear guidelines on the conduct of psychological evaluations:

1. **Standard 9.01: Bases for Assessments** – Psychologists must base their assessments, recommendations, and reports on sufficient information and techniques that are consistent with established scientific and professional knowledge.

2. **Standard 9.06: Interpreting Assessment Results** – Evaluations and assessments must consider the purpose of the assessment, the characteristics of the person being assessed, and the context in which the assessment is conducted. Using outdated or irrelevant data is contrary to this standard.

3. **Standard 9.08: Obsolete Tests and Outdated Test Results** – Psychologists are prohibited from using outdated or obsolete tests and assessments. The use of such

materials fails to meet the professional standards and can result in inappropriate conclusions or recommendations.

In Colorado, legal requirements for psychological evaluations are closely aligned with the ethical standards set by professional organizations such as the American Psychological Association (APA).

The relevant legal framework includes:

**Colorado Revised Statutes (C.R.S.) § 14-10-127:** This statute governs the appointment and   conduct of professionals in child custody cases, including Parental Responsibility Evaluators (PREs). Under this statute, a PRE must be court-appointed and operate within the bounds of the court order. The evaluator's role is to provide the court with relevant and current information to make informed decisions in the best interests of the child. The use of outdated or irrelevant psychological evaluations, especially those older than eight years, fails to meet the required standard of care and may be considered inappropriate and legally questionable.

Moreover, **C.R.S. § 14-10-127** emphasizes that psychological reports and evaluations must be relevant to the individual's present circumstances. Access to sealed court documents or psychological reports without court permission violates confidentiality and privacy protections, raising significant legal concerns.

39. Edward Budd's acceptance of fraudulent evidence not only violates the

Federal Rules of Evidence but also constitutes a clear abuse of his professional duties and a breach of the Plaintiff's constitutional rights. Budd's actions, in collusion with Defendants Ivanova and Wilbrandt, were primarily aimed at forcibly removing the Plaintiff from her home, leading to intentional infliction of emotional distress, defamation, harassment, invasion of privacy, and a conspiracy to cause severe harm, all driven by pure malice, particularly in collaboration with Wilbrandt and Ivanova. By failing to exercise due diligence in protecting the Plaintiff's rights and allowing the introduction of fraudulent evidence, Budd violated the Plaintiff's Fourteenth Amendment rights, which guarantee due process and protection against unwarranted governmental intrusion. Furthermore, Budd's failure to protect the Plaintiff from potential harm, despite clear indications of danger posed by Ivanova, underscores a gross negligence of his obligations as a Parental Responsibilities Evaluator (PRE) and further exacerbates the Plaintiff's suffering.

40. Quasi-immunity does not protect individuals who exceed their authority, violate constitutional rights, or engage in actions that are outside the scope of their court-appointed duties. Dr. Budd's actions—including his unauthorized evaluation of the Plaintiff, his access to sealed records, and his constitutional violations—place him outside the protection of quasi- immunity. The Plaintiff's Fourteenth Amendment rights were violated through Dr. Budd's actions, and as such, he should be held accountable in federal court for these constitutional violations. The absence of a court order, coupled

with the ethical and legal breaches, underscores that Dr. Budd's actions were not protected by quasi-immunity their was no court order no agreement to invade Plaintiff's personal life and no cause to collude to remove from her home or that she was a danger to any child. The constitutional right to live in a home without fear of being removed is rooted in several key constitutional principles, particularly those enshrined in the Fourteenth Amendments to the United States Constitution

41. In PRE Report filed in Boulder County Case 2022DR12 Edward Budd stated: "I fully include a parent's significant other if (a) the parent and significant other are married or engaged to be married; or (b) the significant other and the parent live together; or (c) the significant other plays a noteworthy role in taking care of the child. When my office manager collects information in preparation for scheduling, he asks each parent if he or she has a significant other to whom any of those criteria applies. When my office manager asked Bill those questions, Bill either misunderstood or evaded the question. Consequently, I created a schedule that did not include appointments with Judi Atwood. " In contrast, Justice Directive 21-02 specifies that only individuals who are court-ordered are required to participate in the process. The directive does not mandate the inclusion of significant others unless they are explicitly included in the court order. This creates a distinction where Dr. Budd might involve significant others based on practical considerations, whereas the directive only requires participation from those under court order.

42. In Edward Budd's PRE report filed into Boulder County Case 2022DR12 Edward Budd stated "When I met with the parties on December 6, I learned about the omission. In his intake paperwork, Bill listed Judi as a live-in. Iskra also told me Judi lives with Bill. During a December 9 follow-up interview with Bill, I asked why he didn't tell my office manager that Judi lives with him. Bill replied "I did tell him I'm pretty sure. ... I was traveling though, I had to pull over on the side of the road." Bill added "I said she just doesn't interact with him very much because every night we're at therapies and tutoring, so there's only an hour a night of interaction time." He went on to say that last year, Judi spent six months in Canada. I told Bill that at minimum, I would need for Judi to write a life history and complete a questionnaire. I gave the materials to Bill, and asked him to have Judi get the information to me as soon as possible.  Under Colorado Revised Statutes Title 14, Domestic Matters § 14-10-127, which governs the evaluation and reporting process in cases concerning the allocation of parental responsibilities, the court holds the authority to order evaluations by qualified mental health professionals. The statute emphasizes that such evaluations are conducted to assist in determining the best interests of the child, with the child's safety being paramount.

43. In Edward Budd's PRE report filed into Boulder County Case 2022DR12

41

Edward Budd stated "The plot thickened when I reviewed documents. Bill's document set included a letter, dated March 25,2021, from Sean McAndrew. Mr. McAndrew shared his perceptions of Willi and of Bill's parenting. Mr. McAndrew wrote that he observed Willi during approximately 1,150 hours spend in Bill's home "providing Supervised Visitation for two children unrelated to Willi." The two children were evidently Judi's daughters. Willi told me Judi no longer sees her daughters because their father is "mean." Defendant Budd appears to be inserting personal opinions or speculative comments, such as "The plot thickened," which suggests bias and a narrative-driven approach rather than an objective, clinical assessment. This can undermine the credibility of the psychologist's evaluation. None of the evidence against Defendant Ivanova's irrational, harassment and Ivanova's troubling pattern of emotional manipulation against Plaintiff made it in Edward Budd's PRE. Defendant Budd clearly used references and information provided by third parties (Sean McAndrew and W) without verifying the accuracy or relevance of these claims. Making statements based on unverified information can lead to inaccurate conclusions. Moreover, Budd discusses personal details about Plaintiff's relationship with her daughters and her ex-partner, which may not be directly relevant to the evaluation of Bill's parenting abilities. Bringing up unrelated personal matters can distract from the primary focus of the evaluation, which should be the child's best interests and the parent's capabilities. The court appoint Edward Budd to evaluate the parties involved in 2012DR22 under 14-10-

116.5, the Plaintiff is not partied to that case.    Using statements made by a child about complex adult relationships in a legal evaluation can be misleading and may not reflect the full context or truth. Children might not fully understand the situations they are commenting on, and their statements can be influenced by various factors, including stress or bias.    It is ethically questionable to include and use a child's statements to make judgments about individuals who are not part of the legal case. This can lead to unfair characterizations and potentially harm those who are not in a position to defend themselves within the legal process.    The phrase "the plot thickened" is colloquial and not suitable for a professional report or communication. It detracts from the seriousness and professionalism expected in psychological evaluations and legal contexts.

44. In PRE Report filed in Boulder County Case 2022DR12 Edward Budd stated: "At that point, I knew that Judi had lived with Bill for roughly half of Wllli's life and that she had been restricted to supervised parenting time with her children for an extended period. That it was necessary to evaluate Judi had become obvious. I asked my assistant to arrange for Judi to come to my office for interview and psychological testing. We have been unable to schedule those procedures. Bill was asked to have Judi call us, but we didn't hear from her. Bill later suggested that we can Judi directly and provided a phone number. Judi has not returned our calls. As of December 24, I had not received her written history and questionnaire responses as requested on December 9. In short, Judi should have been a full participant in this evaluation. The

omission will be addressed further in the recommendations section. " As a matter of fact Plaintiff did communicate with Edward Budd. Plaintiff conferred with her family law attorney that informed her of her rights regarding volunteering to participant in the PRE since Plaintiff had no court orders. Had Edward Budd's conduct at her residence not been alarmingly unprofessional, she might have considered participating. However, given the reliance on falsified evidence, Plaintiff quickly discerned that Edward Budd was in collusion with Defendants Ivanova and Wilbrandt. In Colorado, Parenting Responsibility Evaluators (PREs) are permitted to collect collateral information, including police reports, Child Protective Services (CPS) records, and other pertinent documents, to inform their evaluations. These records are crucial for assessing the best interests of the child and the parental capabilities of those involved.

Moreover, none of these reports concerning Plaintiff were referenced, primarily because Edward Budd lacked the requisite court orders to obtain such records, fully aware that they did not exist. Instead, he manipulated judicial staff, unlawfully acquiring court documents—clearly provided by Defendant Wilbrandt, who, as a licensed Colorado attorney, is uniquely positioned among the three defendants to access and utilize court filings.

45. " Recommendation Necessitated by Missing Information
A litigating parent's relational partner could be the world's most enlightened and capable caregiver; a meth-addicted child abuser; or anything between those extremes. Until I've

44

evaluated the significant other, I just don't know. Because Judi Atwood and/or Bill made it impossible for me to evaluate her, I still don't know. The importance of the question is heightened by the very few things I know about Judi. One is that she was restricted to supervised parenting time with her daughters. It's impossible to know whether Judi poses a risk to Willi without knowing why that restriction was imposed and what has happened since. A second worrisome fact is that in January of 2021, Judi sent odd emails, regarding Iskra, to a number of third parties, purportedly including Iskra's employer. That sort of behavior is irrational and destructive. Third, just before and after midnight on December 19 and 20,2021, Judi reportedly called Iskra six times in a six-minute period to tell her Willi is "gay." If Judi actually did that, it's another example of irrational behavior. Given those considerations, I'll make a recommendation regarding Willi's exposure to Judi: (1) Willi should not he in the presence of Judi  Atwood until she has undergone a comprehensive evaluation. That evaluation should address the reasons for her restriction to supervised parenting time with her children. The evaluation should also include psychological testing and assessment of Judi for current adaptive functioning. "  Not only are are these statements false the statements are completely inappropriate, not based on facts , present and unwarranted opinion and unquestionably shows Defendant Budd's actual and implied bias against Plaintiff.   Statements and evidence supplied by Defendant did not include that she is known for making false statements, harassing the Plaintiff and statements made regarding the calls were clearly

made to manipulate Edward Budd which she clearly did.  Plaintiff recognizes the language used by Budd it was the narrative in one of the PRE's filed years ago in her own Boulder County Court Case.  It's based on a manipulative narrative much like the harmful statements made by Ivanova regarding Plaintiff calling her.  In the totality of the circumstances Budd's , inappropriately and incorrectly shed an extremely bad light on Plaintiff and shows not only the lack of Professionalism but Defendant Edward Budd but an actual implied bias that is clearly fueled by a delusional and jealous Ivanova.  Edward Budd inappropriately took statements from a minor and from Ivanova and did not investigate the facts and circumstances in which his report was written in regards to Plaintiff.   Edward Budd did not include emails to 3rd parties in regards to Plaintiff  nor did Edward Budd include the outrageous history of Ivanova lying to the police, begging for money, approaching Plaintiff's children, relentless torment,  Ivanova's malice, jealousy, and manipulative tactics.  Instead in the Defendant's  summary he made inappropriate  comments that he clearly didn't investigate, used his son to harass Plaintiff and he did this knowingly he had no court orders to investigate.  Dr. Edward Budd's reputation, both in the news and across online platforms, is significantly tarnished. Multiple sources document a pattern of negative public perception, which raises serious concerns regarding his professional conduct and credibility:

https://www.propublica.org/article/both-parents-agree-child-is-being-harmed-who-will-courts-believe

https://www.yelp.com/biz/budd-edward-c-phd-littleton

## **DEFENDANT WILBRANDT**

46. Defendant Wilbrandt is a licensed attorney with extensive experience in legal procedures, including the issuance of court orders, subpoenas, and depositions. Her firm, Wilbrandt Law, specializes in various aspects of family law—such as divorce, child support, parental responsibilities, and mediation—demonstrating a thorough understanding of legal processes and an ability to effectively navigate complex legal systems. With over 30 years of legal experience, Defendant Wilbrandt and her team are adept at handling critical legal documents and proceedings fundamental to family law. Their practice not only prioritizes protecting clients' interests but also focuses on resolving conflicts efficiently, often outside the courtroom. This reflects a deep understanding of both procedural and strategic elements of family law.

Given this background, Defendant Wilbrandt possesses the requisite expertise to issue subpoenas and depositions properly and to comprehend the appropriate use and significance of court orders. However, in the case of the Plaintiff, Defendant Wilbrandt failed to adhere to the necessary legal processes to ensure due process and a fair hearing. Instead, she colluded with other Defendants and engaged in improper communications with Plaintiff's opposing counsel, who has a documented history of inappropriate

discussions about Plaintiff with other attorneys. In Colorado, under ABA Standard 6.32, the presumptive sanction for violating Colo. RPC 4.2 is suspension. However, it is rare for attorneys in Boulder County to be held accountable for communicating with individuals improperly within the legal system, especially when such communication causes injury or interferes with the legal proceedings. Defendant Wilbrandt's actions were driven by a selfish motive to gain an advantage in her civil litigation against Plaintiff's boyfriend, potentially amounting to a tactical maneuver rather than legitimate legal advocacy.

47. Defendant Wilbrandt's personal experience with divorce, which inspired her to pursue a career in family law, might influence her perspective in cases involving divorce and child custody. Plaintiff was repeatedly subjected to false documents to the court under the guise of advocacy by Wilbrandt. Defendant Wilbrandt repeatedly disregarded communications from Plaintiff's attorney and aggressively pursued the Plaintiff without regard for empathy or factual accuracy. It is deeply concerning that, despite her professed commitment to safeguarding her clients' interests while minimizing collateral damage, Defendant Wilbrandt has exhibited a willingness to mislead the court to protect a client with a well-documented history of dishonesty, including providing false statements to professionals and neglecting the health and safety of Plaintiff's children. Although Defendant Wilbrandt is highly experienced and recognized in the domain of domestic relations law, her actions reflect a significant disregard for the welfare of the

Plaintiff and her children. Her extensive focus on family law appears to have

compromised her capacity for sound ethical judgment—not only in advising her client,

who has seemingly been encouraged to pursue a personal vendetta against the Plaintiff

without regard for the consequences but also in the selection and management of the

professionals she employs to navigate these legal challenges.

48. On December 20, 2021, Defendant Wilbrandt asserted in an email that the

Plaintiff had called her at midnight. In support of this claim, Wilbrandt promptly sent an

email containing a falsified phone record, which ironically indicated that the calls

originated from a private number and were never answered. The email also included the

statement that the Plaintiff allegedly said, "William is gay." By transmitting these

assertions directly to a Parenting Responsibility Evaluator (PRE), Defendant Wilbrandt

effectively endorsed the accuracy of these fraudulent statements. This action underscores

that Wilbrandt's advocacy was conducted with malice, as she knowingly accepted

responsibility for disseminating false information.  The integrity of the legal profession

relies on strict adherence to ethical standards. Wilbrandt's actions, if left without

accountability, could undermine public trust in the judicial system and the legal

profession as a whole.

49. On August 2, 2022, orders were issued against Plaintiff in case 2012DR22.

Despite not having conducted any evaluation of Plaintiff, Dr. Budd submitted

psychological analysis and recommendations, asserting that Plaintiff posed a danger to

W and should not be allowed in his presence within Plaintiff's home. Defendant Wilbrandt, fully aware of the proper procedures to obtain a court order for a psychological evaluation, deliberately refrained from requesting such an order, knowing that Plaintiff was not a party to the case.

Defendant Ivanova presented Plaintiff court file to a PCDM. Only Wilbrandt has access to the court filings which were clearly shared with Ivanova and Budd. Wilbrandt accessed and shared Plaintiff's court files with a Parenting Responsibility Evaluator (PRE) without a court order, such actions could be scrutinized under Colorado Rule of Professional Conduct 1.6(a). This rule prohibits a lawyer from revealing any information related to the representation of a client without the client's informed consent, unless otherwise authorized by law or implied by the nature of the representation.

1. **Unauthorized Disclosure**: If Wilbrandt accessed Plaintiff's court files and shared them with the PRE without proper authorization (i.e., a court order or the client's informed consent), that is a violation of Rule 1.6(a). The rule explicitly forbids disclosing any information related to client representation, including information that may already be part of the public record, unless one of the rule's specific exceptions applies.

2. **Confidentiality Breach**: Sharing court files or any other information related to the Plaintiff without consent or a court directive is a breach of the duty of confidentiality. This is particularly concerning because it involves disclosing

potentially sensitive or strategic information that the Plaintiff may not have wanted to be shared with a third party, such as a PRE.

3. **Lack of Implied Authorization**: Wilbrandt shared the files was neither authorized by Plaintiff's Attorney on her family law case  and was given to her client that was clearly seeking malice against the Plaintiff, such as if the disclosure was essential to advancing the client's case. Without any justification, her actions are improper.  Wilbrandt had access to Plaintiff's court files but used only selective information for her purpose and collusion with the other Defendants.

4. **Potential Consequences**:  Wilbrandt violated her ethical obligations under Rule 1.6(a) by colluding with her client to misrepresent the truth and to deceive a Parenting Responsibility Evaluator (PRE), actions that she unjustifiably rationalized as related to her representation of Ivanova. Wilbrandt engaged in a pattern of misconduct, which is particularly egregious given her status as a licensed attorney. Her actions should be scrutinized with added severity due to her apparent bias, stemming from her own difficult divorce, which she has inappropriately projected onto her opposing parties, including the Plaintiff in this case.

50.  On July 11, 2022 Plaintiff sent a letter to the Chief Judge in Boulder County about the actions of Defendants Budd and Wilbrandt.  In lieu of going to the Cheif Judge

it was given to the Magistrate in 2022DR12 Sangeetha Mallavarapo. After Plaintiff's attorney in her domestic case failed to reach a resolution with Defendant Wilbrandt, Plaintiff reviewed the court rules for communicating with a Chief Justice. Plaintiff was deeply perplexed by Wilbrandt's continued involvement of Plaintiff in case 2022DR12 without issuing a subpoena or scheduling a deposition. Wilbrandt was fully aware that by keeping Plaintiff out of the courtroom, she could inflict harm upon Plaintiff and assist Defendant Ivanova in seeking personal satisfaction against Plaintiff's boyfriend by destroying his family bonds and causing their separation.

In response, Plaintiff drafted a letter highlighting the miscarriages of justice occurring at the Boulder County Courthouse, particularly the conduct of holding hearings without the involvement of the affected parties. Plaintiff's situation bears significant similarities to *People in the Interest of T.L.*, where the court's failure to provide adequate notice and the opportunity to be heard resulted in a ruling that violated the principles of due process. In *T.L.*, the Colorado Court of Appeals emphasized the necessity of providing parties with the opportunity to be heard before any judicial action is taken that affects their rights, underscoring the fundamental nature of due process in legal proceedings.

As an indigent individual, Plaintiff was clearly exploited by Wilbrandt, who knowingly disregarded the constitutional rights guaranteed to all citizens, including the right to due process. Due process, as enshrined in the Fourteenth Amendments of the

United States Constitution, ensures that no person shall be deprived of life, liberty, or property without adequate legal proceedings, including notice and the opportunity to be heard. Wilbrandt's actions violated these fundamental rights by proceeding with legal actions against Plaintiff without ensuring her presence or participation in the hearings.

Plaintiff's case exemplifies a grave violation of due process, as Wilbrandt's strategy effectively denied Plaintiff the constitutional protections intended to prevent such injustices. This conduct not only contravenes the principles of fairness but also undermines the integrity of the judicial process, necessitating serious consideration by this Court.

51.  On August 4, 2022 without the Plaintiff in the present Wilbrandt said the following: "We have a date by which Mr. Beltz shall no longer allow Ms. Atwood to be in the presence of the child. " The content and context of the statement indicate a deliberate intent to inflict emotional and psychological harm on the Plaintiff. By ensuring that she was not present to challenge the statement or defend her relationship her rights to be in her own home, Wilbrandt's actions appear to be not just legally aggressive but personally vindictive. The use of the legal process in this manner goes beyond advocacy and enters the realm of cruelty, as it aims to sever the Plaintiff's bond with Mr. Beltz and his son without proper judicial scrutiny or the opportunity for defense.   Plaintiff is described as being in a vulnerable position, likely due to financial or personal circumstances that limited her ability to fully participate in the legal process.

Exploiting this vulnerability to make such a critical and life-altering decision without her involvement demonstrates a lack of compassion and disregard for the principles of fairness and justice. It suggests an intention to capitalize on the Plaintiff's disadvantaged situation, further compounding the harm done.   The fact that this statement was made without the Plaintiff being present is a clear violation of due process. In legal proceedings, every party has the right to be present and heard, especially when decisions that significantly impact their rights and relationships are being made. By proceeding in Plaintiff's absence, Wilbrandt exploited the situation to secure an outcome without giving the Plaintiff a fair chance to defend her interests or contest the allegations.

52.  Sangeetha Mallavarapo was Judicial Officer in Boulder said the following about Plaintiff in her court room "Mr. Seat, I'm just going to tell you, there are some – there are issues with Judy Atwood.  And to be honest, she is sent --------she frequently send things, which I didn't know, to judicial staff, and it's a problem.  In fact, it's so much of a problem that I don't think anyone actually takes it seriously, because it's --- I mean, it's nonsense."   Sangeetha Mallavarapo is no longer serving as a Judicial Officer in Boulder County.   Plaintiff is a well respected volunteer at the Colorado Office of Judicial Performance Evaluation.   Has worked relentless to pass bills and has had an active role in the creation and passage of Colorado Julie's Law, HB21-1228. This crucial legislation established essential training and accountability measures for Parental Responsibilities Evaluators (PREs) and Child and Family Investigators (CFIs). The law

also provided guidance to courts on the potential misuse of Parental Alienation Syndrome (PAS) as a defense for abusers, and it mandated that court personnel complete training in domestic violence and child abuse to be eligible for court appointments.  In 2022, Plaintiff  supported the passage of Federal Kayden's Law, S.3623, as part of the Violence Against Women Act (VAWA) Reauthorization. The Colorado legislation further reinforced training requirements and emphasized the protection of children in custody cases involving abuse allegations.   In addition the Plaintiff's contributions included providing an essay regarding her experience in Boulder County Courts and has testified at United Nations, through its Special Rapporteur on violence against women and girls, has expressed strong concerns about the use of Parental Alienation Syndrome (PAS) in custody cases, particularly when allegations of abuse are involved. The UN reports that PAS, which lacks a solid scientific basis, is often used in a manner that can mask genuine instances of domestic violence and child abuse. This is particularly problematic because it can lead to custody decisions that favor the alleged abuser by discrediting the protective parent, usually the mother, under the guise of "alienation."

The UN's recommendations emphasize that courts should avoid relying on PAS in such cases, as it can perpetuate gender bias and result in harmful outcomes for both women and children. The UN calls for custody decisions to prioritize the best interests of the child, focusing on protecting victims of violence and ensuring that any allegations of abuse are thoroughly investigated without being dismissed by claims of alienation.

The information is available here:

https://news.un.org/en/story/2023/06/1138057

https://www.ohchr.org/en/documents/thematic-reports/ahrc5336-custody-violence-against-women-and-violence-against-children

Plaintiff has testified and worked relentlessly to pass legislation in 2023 on Colorado Kayden's Law HB23-1178, which aligned state training requirements with federal standards, outlawed forced reunification, and expanded the admissibility of evidence regarding past violence and abuse.

This year, Plaintiff worked and contributed and advocated for Colorado HB24-1350, which provides a comprehensive definition of coercive control, establishes procedures for including the child's voice in court proceedings, streamlines the complaint process for court personnel, and implements the recommendations of the HB23-1108 task force. Three weeks ago Plaintiff spoke at Colorado Department of Human Services officials at the 2024 OFA Regions V-VIII State Technical Assistance Meeting on State Financial Assistance (TANF). Although Plaintiff is a contractor with Colorado Department of Human Services most of her work is volunteer and she is not paid. It is very clear that Plaintiff's work would be considered a threat to those Attorneys like Wilbrandt whom rely on manipulating Judicial Officers as part of their advocacy for their client would want to ensure that Plaintiff's voice is not heard in the

court room.

53.  On June 1, 2024, Plaintiff sent a Cease and Desist letter to Defendant Wilbrandt.  **Exhibit E**  Despite this, Wilbrandt has continued to file motions and present them to Judicial Officers, alleging that Plaintiff poses a threat to Ivanova's child. These actions persist even though Wilbrandt is aware that Ivanova has exhibited dangerous behavior, including attacking Plaintiff's boyfriend and falsely accusing him to the police, leading to his arrest while he was holding their 3-month-old child.

It is evident that Wilbrandt is not merely representing her client, but is also engaging in a collusive effort with Ivanova and Budd, driven by a deeply personal and vindictive vendetta against Plaintiff. Wilbrandt is abusing her position as an attorney, manipulating the legal system, and committing fraud upon the court by deliberately misrepresenting the facts to advance this agenda.

## CONSEQUENCES OF ALL THE AFOREMENTIONED FACTS

54. As a direct, immediate and proximate result of all the preceding allegations of this Complaint, Plaintiff's bond with her children and the bond between Plaintiff's children and her boyfriend's has been completely severed.

a. Even with Plaintiff's custody restored the damage to the familiar unit at Mr. Beltz's home has been damaged.

b. Plaintiff has suffered several hospitalization and major medical

conditions that can not be reversed.

      c. Plaintiff has been subjected to a court order that prohibits her from being in the presence of Mr. Beltz's son. As a direct result of this order, Plaintiff has suffered severe emotional and psychological distress, leading to her treatment for severe depression. This restriction has profoundly impacted her daily life and well-being.

Plaintiff is unable to interact freely within her own home; she is essentially confined to certain areas and cannot move about her living space without announcing her intentions. Simple, everyday activities, such as preparing her own meals or going for a walk, require prior notification, further exacerbating her sense of isolation and loss of autonomy.

      This situation has imposed significant emotional burdens on Plaintiff, stripping her of basic freedoms and subjecting her to conditions that are dehumanizing and psychologically damaging. The enforced restrictions within her own home contribute to an environment of constant surveillance and control, aggravating her depression and hindering her ability to lead a normal, independent life. These conditions, imposed without just cause, highlight the severe and ongoing harm Plaintiff is enduring as a result of the court's order, compounded by the actions of the defendants.

      d. The ongoing actions against Plaintiff—infliction of emotional distress, defamation, harassment, invasion of privacy, and conspiracy to cause severe harm—are

having profound and detrimental effects on her mental and emotional well-being. These actions demonstrate a clear intent to cause harm, driven by malice, and are severely impacting Plaintiff's quality of life.   The relentless emotional strain placed on Plaintiff is leading to significant psychological damage. The deliberate actions taken against her, including false accusations and manipulations, have created a hostile environment that has resulted in severe anxiety, depression, and other mental health issues. The constant fear and uncertainty are preventing Plaintiff from living a normal, peaceful life.

e. False statements made about Plaintiff have tarnished her reputation and standing within her community and beyond. These defamatory actions are not only damaging her personal relationships but also her professional opportunities. The spreading of lies and misinformation is contributing to her emotional distress, as she has to continually defend herself against baseless accusations.

f. Persistent harassment is exacerbating Plaintiff's emotional turmoil. The repeated and targeted attacks are making it impossible for her to feel safe or secure in her own home or community. The harassment is not only a violation of her personal space but also a constant reminder of the malice directed towards her, further deepening her psychological distress.  Plaintiff no longer feels safe in the Boulder County Court House and has severe stress during her own litigation as the result of all of the Defendants actions.

g. The unauthorized and intrusive actions taken against Plaintiff, such as

59

unwarranted surveillance or the sharing of private information, are stripping her of her basic rights to privacy. This invasion is not just a legal violation but a personal affront that intensifies her sense of vulnerability and helplessness.

h. The coordinated efforts by multiple parties to inflict harm on Plaintiff highlight a calculated and malicious intent to destroy her emotionally, socially, and psychologically. This conspiracy is designed to maximize the impact of the distress and damage caused, leaving Plaintiff in a state of constant fear and distress, unable to find respite or relief. The cumulative effect of these actions is creating an environment of relentless psychological torture for Plaintiff. The emotional and mental toll is profound, leading to severe depression, anxiety, and a diminished capacity to lead a normal life. These actions are not just legal violations but are fundamentally inhumane, showcasing a level of malice that is deeply troubling and unacceptable in any context.

i. As a direct and immediate consequence of the preceding events, Plaintiff was diagnosed with Post-Traumatic Stress Disorder (PTSD) in or around September 2022. Around the same time, Plaintiff's children also began receiving treatment from a psychiatrist for multiple psychological issues, including trauma. These diagnoses underscore the profound impact of the events on both Plaintiff and her children, highlighting the severe emotional and psychological harm they have endured.

## V. **FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983– Fourteenth Amendment Violation – Deprivation of Right to**

## Familial Association without Due Process of Law
## (against all Defendants)

55. Plaintiff incorporates by reference the preceding allegations of this Complaint as though each was individually set forth herein at length.

56. The actions of all above-captioned Defendants described herein intentionally deprived Plaintiff of the securities, rights, privileges, liberties, immunities secured by the Constitution of the United States of America, including, but not limited to, deprivation of familial association without due process of law, as guaranteed by the Fourteenth Amendment of the Constitution of the United States of America.

57. The above-captioned Defendant's conduct was known by the above-captioned Defendants to clearly violate established statutory or Constitutional rights of Plaintiff which a reasonable person would have known.

58. All of the above-captioned defendants deprived Plaintiff's civil right to familial association without due process of law by intentionally and/or deliberately and/or maliciously engaging in conduct that deprived Plaintiff's Constitutional right to familial association by depriving Children from Plaintiff due to their actions.

59. Some of the conduct involved, but is not limited to, all or some of the above-captioned defendants engaging, and/or conspiring to engage, in conduct which involved asserting that Plaintiff was making phone calls to Defendant Ivanova, as assertion that was patently false and was known by the above-caption defendants to be false and/or

made with reckless disregard to its falsity. All or some of the above-captioned defendants asserted this assertion to government entities and/or Boulder County District Court of Colorado.

60. Some of the conduct involved, but is not limited to, all or some of the above-captioned defendants engaging, and/or conspiring to engage, in conduct which involved presenting and/or offering and/or testifying and/or asserting facts that were patently false and wee known by the above-captioned defendants to be so false and/or made with reckless disregard to the Boulder County District Court of Colorado.

61. As a direct, immediate and proximate result of Defendant's conduct Plaintiff's loss of her familial association with Children and Children loss their familial association with one another.

62. As a direct and proximate result of the actions detailed in the preceding allegations of this Complaint, the Boulder County District Court effectively imposed restrictions on Plaintiff's access within her own home, infringing upon her fundamental rights to privacy and liberty.

The home is a place of sanctuary, where the expectation of privacy is at its highest. By restricting Plaintiff's movement and access within her own home, the court's order intrudes upon this protected space, violating the constitutional rights afforded under the Due Process Clause of the Fourteenth Amendment. This clause ensures that all

individuals are treated fairly and justly, particularly in matters affecting personal privacy and the sanctity of the home.

Moreover, these restrictions, imposed without adequate justification or procedural safeguards, amount to a deprivation of liberty, further underscoring the constitutional violations at play. The imposition of such constraints within one's own home is a severe and unjust infringement on Plaintiff's rights.  The Supreme Court has consistently held that the home is a special place deserving of heightened protection. In cases like *Katz v. United States* (1967) and *Kyllo v. United States (2001),* the Court emphasized that the home is where the expectation of privacy is at its peak, and government actions that intrude upon this space are subject to strict scrutiny.

63. As a direct, immediate, and proximate result of the preceding allegations, Plaintiff experienced severe medical issues and was diagnosed with Post-Traumatic Stress Disorder (PTSD) and Depression in or around September 2022. Additionally, the Plaintiff's children were diagnosed with severe psychological issues during the same period. The restrictions imposed on Plaintiff within her own home, including limitations on her interactions with Mr. Beltz's son, have had a profound impact not only on her well-being but also on her children. These restrictions have caused the children to perceive their mother as a criminal, further exacerbating their emotional and psychological distress. This situation has severely undermined the family's stability and well-being, leading to lasting harm.

## VI. <u>SECOND CLAIM FOR RELIEF</u>

### 42 U.S.C. § 1983 – Fourteenth Amendment Violation – Conspiracy to Deprive Right to Familial Association without Due Process of Law

### (against all Defendants except Ivanova)

64.  Plaintiff incorporates by referencing the preceding allegations of this Complaint as though each was individually set forth herein at length.

65. The actions of all above-captioned Defendants, as described herein, were carried out under the guise of aiding the court but effectively conspired to intentionally deprive Plaintiff of the securities, rights, privileges, liberties, and immunities secured by the Constitution of the United States of America. Given that both the attorney and the Parenting Responsibility Evaluator (PRE) have the ability to address the court directly, they wield significant influence over judicial decisions. Their actions, therefore, had a substantial impact in depriving Plaintiff of her right to familial association and due process, as guaranteed by the Fourteenth Amendment to the United States Constitution.

66.  The above-captioned Defendant's conduct was known by the above-captioned Defendants to clearly violate established statutory or Constitutional rights of Plaintiff which a reasonable person would have known.

67. Defendants Wilbrandt and Budd agreed in some manner with one another to do an act that deprived Plaintiff of her familial association without due process of law.

68. Both Wilbrandt and Budd acted in at least one act in furtherance of the conspiracy.

69. Both Wilbrandt and Budd of the above-captioned deprived Plaintiff's civil right to familial association without due process of law by intentionally and/or deliberately and/or maliciously engaging in conduct that deprived Plaintiff's Constitutional right to familial association by depriving Children from Plaintiff due to their actions.

70. Some of this conduct involved, but is not limited to, all or some of the above-captioned defendants conspiring to engage, in conduct which involved asserting that Plaintiff was harming children, as assertion that was patently false and was known by the above-captioned defendants to be so false and/or made with reckless disregard to its falsity. All or some of the above-captioned defendants asserted this to government entities Boulder County District Court.

71. Some of this conduct involved, but is not limited to, all or some of the above-captioned defendants conspiring to engage, in conduct which involved presenting and/or offering testifying and/or asserting facts that were patently false and were known by the above-captioned defendants to be false and/or made with reckless disregard to the Boulder County District Court of Colorado.

72. As a direct, immediate and proximate result of all the preceding allegations in this Complaint the Boulder County District Court effectively ordered that Plaintiff loose her rights to freedom in her own home and lose her ability to have any relationship with her boyfriend's son impacting all the children in her home.

73.  As a direct, immediate, and proximate result of the preceding allegations, Plaintiff experienced severe medical issues and was diagnosed with Post-Traumatic Stress Disorder (PTSD) and Depression in or around September 2022. Additionally, the Plaintiff's children were diagnosed with severe psychological issues during the same period. The restrictions imposed on Plaintiff within her own home, including limitations on her interactions with Mr. Beltz's son, have had a profound impact not only on her well-being but also on her children. These restrictions have caused the children to perceive their mother as a criminal, further exacerbating their emotional and psychological distress. This situation has severely undermined the family's stability and well-being, leading to lasting harm.

## VII. <u>**THIRD CLAIM FOR RELIEF**</u>
### Fraud Upon the Court
### (against Defendant Budd)

74.  Defendant Budd committed an intentional fraud by alleging to the Boulder County Dristrict Court of Colorado that Plaintiff was a risk to children

"Recommendations : Recommendation Necessitated by Missing Information

A litigating parent's relational partner could be the world's most enlightened and capable caregiver; a meth-addicted child abuser; or anything between those extremes. Until I've evaluated the significant other, I just don't know. Because Judi Atwood and/or Bill made it impossible for me to evaluate her, I still don't know. The importance of the question is heightened by the very few things I know about Judi. One is that she was restricted to

supervised parenting time with her daughters. It's impossible to know whether Judi

poses a risk to Willi without knowing why that restriction was imposed and

what has happened since. A second worrisome fact is that in January of 2021, Judi sent

odd emails, regarding Iskra, to a number of third parties, purportedly including Iskra's

employer. That sort of behavior is irrational and destructive. Third, just before and after

midnight on December 19 and 20,2021, Judi reportedly called Iskra six times in a six-

minute period to tell her Willi is "gay." If Judi actually did that, it's another example of

irrational behavior. Given those considerations, I'll make a recommendation regarding

Willi's exposure to Judi: (1) Willi should not he in the presence of Judi  Atwood until she

has undergone a comprehensive evaluation. That evaluation should address the reasons

for her restriction to supervised parenting time with her children. The evaluation should

also include psychological testing and assessment of Judi for current adaptive

functioning. "  a statement Defendant Budd knew was patently false and/or made with

reckless disregard to it's falsity.

75. Defendant Budd committed an intentional fraud by alleging to the Boulder

County District Court of Colorado comparing Plaintiff to a meth-addict, a child abuser,

several emails and making several phone calls and speaking to Defendant Ivanova, these

statements Defendant Budd knew was patently false and/or made with reckless disregard

to its falsity.

76. Defendant Budd committed an intentional fraud by alleging to the Boulder

County District Court of Colorado that Plaintiff's actions was due to methamphetamine and/or was a chronic user of methamphetamine and/or had methamphetamine substance dependence: a statement Defendant Budd knew was patently false and/or made with reckless disregard to its falsity.

77.  Defendant Budd committed an intentional fraud by alleging to the Boulder County District Court of Colorado that Plaintiff's "Willi should not he in the presence of Judi  Atwood until she has undergone a comprehensive evaluation. That evaluation should address the reasons for her restriction to supervised parenting time with her children. The evaluation should also include psychological testing and assessment of Judi for current adaptive functioning"  a statement Defendant Budd knew was patently false and/or made with reckless disregard to its falsity.

78. Defendant Budd committed an intentional fraud by alleging to the Boulder County District Court of Colorado that Plaintiff "Judi sent odd emails, regarding Iskra, to a number of third parties, purportedly including Iskra's employer. That sort of behavior is irrational and destructive" he did so without addressing client's behavior and a statement Defendant Budd knew was patently false and/or made with reckless disregard to its falsity.

79. As a direct, immediate and proximate result of all the preceding allegations in this Complaint the Boulder County District Court effectively ordered that Plaintiff loose her rights to freedom in her own home and lose her ability to have any relationship with

her boyfriend's son impacting all the children in her home.

80.  As a direct, immediate, and proximate result of the preceding allegations, Plaintiff experienced severe medical issues and was diagnosed with Post-Traumatic Stress Disorder (PTSD) and Depression in or around September 2022. Additionally, the Plaintiff's children were diagnosed with severe psychological issues during the same period. The restrictions imposed on Plaintiff within her own home, including limitations on her interactions with Mr. Beltz's son, have had a profound impact not only on her well-being but also on her children. These restrictions have caused the children to perceive their mother as a criminal, further exacerbating their emotional and psychological distress. This situation has severely undermined the family's stability and well-being, leading to lasting harm.

## VIII. <u>FOURTH CLAIM FOR RELIEF</u>

**28 U.S.C. § 4101 - First Amendment Violation – Deprivation of Right to liberty, dignity, ordinary civilian opportunities to work and earn a living, being treated by society as the worst kind of criminal by both slander and libel conspired with intentional harm**

**(against Defendant Ivanova)**

81. Plaintiff incorporates by referencing the preceding allegations of this Complaint as though each was individually set forth herein at length.

82. The actions and omissions of the above-captioned Defendant Ivanova described herein, was to intentionally destroy Plaintiff's character by and through deliberate acts of defaming being libel and slander depriving Plaintiff of the securities,

rights, privileges, liberties and immunities secured by the Constitution of the United States of America, including, but not limited to, deprivation of liberty, economic and social benefits as guaranteed by the First Amendment of Constitution of the United States of America.

83. Some of the conduct involved, but is not limited to, all or some of the above-captioned Defendant engaging, and conspiring to engage with 3rd parties which involved asserting that Plaintiff was a child abuser and emotionally harming Plaintiff's boyfriend's son, as assertion that was patently false and was known by the above-captioned defendant to be false and was known by the above-captioned defendant to be so false and/or made with reckless disregard to its falsity.

84. Defendant Ivanova made false statements to a PRE accusing Plaintiff of making phone calls.  Ivanova made several falsehoods to Plaintiff's PRE, Attorney and PCDM.  Defendant Ivanova secretly spied on Plaintiff by meeting with Plaintiff's ex husband and Plaintiff's opposing counsel Rebecca Pepin to infliction of emotional distress, defamation, harassment, invasion of privacy, and a conspiracy to cause severe harm, all of which demonstrate pure malice and jealousy.

85. Defendant Ivanova agreed in some manner with other Defendants to do an act that deprived Plaintiff of her liberty, and not limited to suffering the loss of her dignity, being treated by society as the worse kind of criminal, suffering the destruction of the ordinary civilian opportunities to work and earn a living and all the economic and social

benefits that accompany an earned living accompanying free citizenship anywhere in the United States, including Colorado.

86. As a direct, immediate, and proximate result of the preceding allegations, Plaintiff experienced severe medical issues and was diagnosed with Post-Traumatic Stress Disorder (PTSD) and Depression in or around September 2022. Additionally, the Plaintiff's children were diagnosed with severe psychological issues during the same period. The restrictions imposed on Plaintiff within her own home, including limitations on her interactions with Mr. Beltz's son, have had a profound impact not only on her well-being but also on her children. These restrictions have caused the children to perceive their mother as a criminal, further exacerbating their emotional and psychological distress. This situation has severely undermined the family's stability and well-being, leading to lasting harm.

87. Plaintiff had to leave the United States of America to feel safe due to deliberate and orchestrated campaign of harassment, defamation, and invasion of privacy, intending to dismantle and destroy Plaintiff's life. The consequences of Defendant Ivanova's actions have been catastrophic, exacting a severe toll that has resulted in immeasurable suffering, profound and enduring emotional distress, significant medical issues, unrelenting torment, grievous personal injury, and the shattering of familial bonds with Plaintiff's children and harm caused by involving herself in false statements that clearly impacted Plaintiff's custody of her children.

Moreover, Plaintiff has suffered a devastating loss of livelihood and property, was forced to relinquish custody of her children, and has been subjected to public scorn, hatred, and merciless ridicule. Defendant's conduct, motivated solely by spite and an inability to accept Mr. Beltz's decision to move on, is not only morally reprehensible but also legally actionable.

88. The above-captioned Defendant knew Plaintiff was indigent and that her son was fond of Plaintiff as a result made false statements with the intent to harm Plaintiff out of pure malice.

89. As a direct, immediate and proximate result of all the preceding allegations in this Complaint the Boulder County District Court effectively ordered that Plaintiff loose her rights to freedom in her own home and lose her ability to have any relationship with her boyfriend's son impacting all the children in her home.

## IX. FIFTH CLAIM FOR RELIEF

**28 U.S.C. 1983 - Fourteenth Amendment Violation – Deprivation of Right to liberty, dignity, ordinary civilian opportunities to work and earn a living, being treated by society as the worst kind of criminal by both slander and libel conspired with intentional harm without due process of law.**

**(against all Defendants)**

90. The actions and omissions of the above-captioned Defendants described herein, conspired to intentionally destroy Plaintiff's character by and through deliberate

acts of defaming being libel and slander depriving Plaintiff of the securities, rights, privileges, liberties and immunities secured by the Constitution of the United States of America, including, but not limited to, deprivation of liberty, without due process of law guaranteed by the Fourteenth Amendment of Constitution of the United States of America.

91.   The above-captioned Defendant's conduct was known by the above-captioned Defendants to clearly violate established statutory or Constitutional rights of Plaintiff which a reasonable person would have known.  All of the above-captioned defendants deprived Plaintiff's civil right to familial association without due process of law by intentionally and/or deliberately and/or maliciously engaging in conduct that deprived Children from Plaintiff.

92.   Some of this conduct involved, but is not limited to, all or some of the above-captioned Defendants, engaging, and/or conspiring to engage, in conduct which involved asserting that Plaintiff was a convicted child abuser and emotionally harming Plaintiff's boyfriend's son, as assertion that was patently false and was known by the above-captioned defendants to be so false and/or made with reckless disregard to its falsity.  All or some of the above-captioned defendants, asserted this assertion to government entities and/or Boulder County District Court of Colorado.

93. Some of this conduct involved, but not limited to, all or some of the above-captioned Defendants engaging, and/or conspiring to engage, in conduct which involved

presenting and/or offering testifying and/or asserting facts that were patently false and were known by the above-captioned defendants to be so false and/or made with reckless disregard to the Boulder County District Court of Colorado.

94. As a direct, immediate and proximate result of Defendants conduct Plaintiff was seen by society as the worse type of criminal.

95. As a indirect and immediate and proximate result of slander and libel statements made to Plaintiff's court appointed officials in her domestic case by Defendant Ivanova  Plaintiff suffered loss of custody for 8 years and was placed on costly supervised visitations for 8 years.

96. The Defendants named in the above-captioned case knowingly removed the Plaintiff's boyfriend's son from familiar relationships, resulting in severe psychological harm to the Plaintiff's children.

97. All of the above-captioned Defendants agreed in some manner with one another to do an act that deprived Plaintiff of her liberty, and not limited to suffering the loss of her dignity, being treated by society as the worst kind of criminal, suffering the destruction of the ordinary civilian opportunities to work and earn a living and all the economic and social benefits that accompany an earned living accompanying free citizenship anywhere in the United States, including Colorado.

## X. **PRAYER FOR RELIEF**

74

WHEREFORE, Plaintiff Judi B. Atwood respectfully requests that this Court enter judgment in her favor and against Defendants and grant:

      a. Immediate injunctive relief;

      b. Appropriate declaratory relief;

      c. Compensatory and consequential damages, including loss of familial association, psychological trauma, emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

      d. Monetary damages for all economic and noneconomic losses on all claims as allowed by law in an amount to be determined at trial;

      e. Punitive damages on all claims allowed by law in an amount to be determined at trial;

      f. Attorneys fees and cost associated with this action on all claims allowed by law;

      g. Pre- and post-judgment interest at the lawful rates; and

      h. Any further relief that this Court deems just and proper, and any other relief as allowed by law.

## XI. **DEMAND FOR TRIAL BY JURY**

Plaintiff demands a trial to a jury on all issue so triable.

Respectfully submitted this 13th Day of August, 2024

Judi B Atwood

Plaintiff Pro Se

1145 Rodriquez Court

Longmont, CO 80501

Phone: (360) 445-0501

jatwood13@yahoo.com



EXHIBIT A



facebook

Iskra Ivanova

Search

FAVORITES
News Feed
Messages                    117
Other                         1
Events                      20+

APPS
The Guardian
The Mood Weather Report
Apps and Games              20+
Photos

GROUPS
First Ward & Elder S...       4
Ceramics Artists in...      20+
Project Row Houses           15
Галерия Синчец /...           9
Sculptural Ceramics         20+
Create Group...

LISTS
Close Friends
Family
Complutense University of...
Universidad Autónoma de...
University of Houston       20+

Tom Callins

I sent him a recommendation letter to read it
with pictures of me

**Tom Callins**
and....

**Iskra Ivanova**
and a gift that a friend of mine made
after he saying that he can not help me with the electric part for my
residency
he is a bastard
asshole
mis650-634 being
i want to cut his head

**Iskra Ivanova**
chopped it
asswhole

**Tom Callins**
well...I'm not sure many men would help with something like this when
you two are going thru the court stuff
I wouldnt ak him for anything other than for Willy

**Iskra Ivanova**
we were going when he said he would
the work is dedicated to Willy

**Tom Callins**
thats not the same
there is no w in asshole btw



facebook

Iskra Ivanova

**FAVORITES**
- News Feed
- **Messages**    117
  - Other    1
- Events    20+

**APPS**
- The Guardian
- The Mood Weather Report
- Apps and Games    20+
- Photos

**GROUPS**
- First Ward & Elder S...    4
- Ceramics Artists in...    20+
- Project Row Houses    15
- Галерия Сончец /...    9
- Sculptural Ceramics    20+
- Create Group...

**LISTS**
- Close Friends
- Family
- Complutense University of...
- Universidad Autónoma de...
- University of Houston    20+

Search

◀ Mess

🖼 Tom Callins

I sent him a recommendation letter to read it
with pictures of me

**Tom Callins**
and....

**Iskra Ivanova**
and a gift that a friend of mine made
after he saying that he can not help me with the electric part for my
residency
he is a bastard
asswhole
mis65l0x634n being
i want to cut his head

**Iskra Ivanova**
chopped it
asswhole

**Tom Callins**
well...Im not sure many men would help with something like htis when
you two are going thru the court stuff
I wouldnt ak him for anything other than for Willy

**Iskra Ivanova**
we were going when he said he would
the work is dedicated to Willy

**Tom Callins**
thats not the same
there is no w in asshole btw

1/20/22, 8:33 PM                    Yahoo Mail - RE: allegations against Rebecca and Steve 1-8-22



EXHIBIT
B

## RE: allegations against Rebecca and Steve 1-8-22

From:  Rebecca Pepin (rpepin@jbplegal.com)

To:     jatwood13@yahoo.com

Date:  Saturday, January 8, 2022, 02:56 PM MST

Ms. Atwood,
I have not had any contact with Iskra Ivanova nor her attorney in years. To the best of my knowledge neither has Steve. I do not know how they got comments from Dr. Udis' report, although you, your counsel, and I have probably cited that report in other filings, and not all of the filings in your case are sealed.

Please stop blaming Steve for things that do not go well in your life.

Sincerely,

Rebecca M. Pepin
Shareholder / Attorney
Pronouns she/her/they/them


 900 S. Main Street, Suite 100
Longmont, CO  80501
303-678-0560
303-678-1164 Fax

5285 McWhinney Blvd., Suite 100
Loveland, CO 80538
970-304-0075

8001 Arista Place, Suite 415
Broomfield, CO 80021-4133
303-678-0560

e-mail:  rpepin@jbplegal.com
http://www.jbplegal.com

NOTICE OF CONFIDENTIALITY
The information contained in this electronic message from Jorgensen, Brownell & Pepin, P.C. and any attachments to this message are intended for the exclusive use of the addressee(s) and may contain confidential or privileged information belonging to the sender.  The information is intended only for the use of the intended recipient.  If you are not the intended recipient or received this electronic message or attachments(s) by mistake, please notify the sender immediately by reply e-mail and then destroy all copies of the transmission.


-----Original Message-----
From: Judi Atwood <jatwood13@yahoo.com>
Sent: Saturday, January 8, 2022 8:02 AM
To: Rebecca Pepin <rpepin@jbplegal.com>
Subject:

Rebecca,

Can you explain to me why Iskra Ivanova has been exchanging information with Steve and meeting up with Steve especially since she has a Cease and Desist?  Of course Steve denies this however we have information otherwise. Are you really talking to Clare her attorney or just directly to Iskra if so why?

1/2



12/22/2021

Iskra Ivanova
979 Moorehead Circle, Apt. G

Boulder, CO 80305


**Re: CEASE AND DESIST DEMAND**

Dear Ms. Ivanova:

Please be informed that this is my formal request to CEASE AND DESIST any further unlawful acts, including but not limited to all forms of criminal and civil harassment, stalking, cyberstalking, bullying, invasion of privacy, libel, slander, and participating knowingly or unknowingly in any action which consists of any physical, verbal, and/or non-verbal assaults directed upon me or my minor children or my other family members.

It has come to my attention that you are making false allegations about me and disseminating said false statements to third parties in written and spoken communications. Recently, on December 20, 2021 you emailed attorney Clara Wilbrandt stating the following:

*"Judi is calling me at 12 am from a private number. I missed her the first time. The second she said: William is a gay. Picture from the calls."(see attached).*

This statement is false and defamatory as I did not call you at 12:04am from a private number. Nor did I call you from a private number stating that

1

*"William is a gay"*.   In fact, I have never called you from a private number or otherwise, nor would I ever consider calling you let alone making a statement about William in this regard or any other to you.

In addition, I have been subject to unwanted telephone calls and emails by third parties acting on your behalf pertaining to matter that do not and should not involve me.  Your unwelcomed invasion into my life and the lives of my loved ones is invasive, harassing, unwanted and in violation of my rights.  Your unlawful behavior has caused severe emotional distress for myself and my family members.

As such, I demand that you and any third parties associated with you and/or acting on your behalf immediately stop any further forms of communication, contact, and or any other forms of unlawful activity against me or my family, as your actions violate our rights under State and Federal law.

Failure to comply with my request to cease and desist your unwelcome and unlawful communications and activities will leave me no other alternative but to contact state/local law enforcement, and  pursue any and all available legal and equitable remedies available to protect my loved ones and me from your unlawful conduct.

Please be guided accordingly.

Sincerely,

Judi Atwood

CC: Clara Wilbrandt

2

Judi-Beth Atwood
1145 Rodriquez Court
Longmont CO 80501



12/22/2021

Dr. Edward C. Budd, Ph. D.

6860 South Yosemite Court, Suite 2000

Centennial, CO 80112

Re: CEASE AND DESIST DEMAND

Dear Dr Budd,

Please be informed that this is my formal request to CEASE AND DESIST any further unwanted communication from you and/or your office. I have been contacted by you and or your office requesting that I take part in a parental responsibility evaluation pertaining to the Beltz/Ivanova case and undergo testing that Mr. Beltz has done already, along with disclosing my life history and questionnaire sent to me by you/your office. Please be advised that I am not a party to the Beltz/Ivanova custody matter, nor am I legally subject to a family responsibility evaluation by you. Additionally, any medical testing that you are seeking to have me take part in is intrusive and violates my privacy rights and uninvited pries into my private health information governed by HIPAA 45 CFR Part 160 and Sub-parts A and E of Part 164.

Judi-Beth Atwood
1145 Rodriquez Court
Longmont CO 80501

That said, I am requesting that you and/or your office cease from contacting me to take part in medical testing, disclosure of information related to my life history and health background.  I am open to being interviewed as a collateral source for Mr. Beltz however, that is all.   I am available virtually to partake in a collateral source interview starting from Jan 6, 2022.

Any additional communications from your office requesting that I take part in anything other than this, is out of the question and without lawful authority to do so.

Failure to comply with my request to cease and desist your unwelcome communications pertaining to these above-referenced inappropriate and unlawful requests will leave me no other alternative but to pursue any and all available legal and equitable remedies against you.

Please be guided accordingly.

Sincerely,

Judi Atwood

EXHIBIT
E

Judi Atwood

1145 Rodriquez Court

Longmont, CO 80501

jatwood13@yahoo.com

360 445 0501

**June 14, 2024**

Clare Wilbrandt

2185 S Sherman St

Denver, CO 80210

**Re: Cease and Desist Unauthorized Disclosure, Use of Personal Information, and Communications with Opposing Counsel**

Dear Ms. Wilbrandt,

I am writing to formally demand that you immediately cease and desist from any further unauthorized disclosure and use of my personal and medical information. Your actions have violated my privacy rights and caused significant emotional distress and harm. Additionally, this cease and desist demand includes a prohibition on contacting my opposing counsel and accessing my files in Boulder County Court.

**Unauthorized Disclosure and Use of Information**

Court Hearing on May 26, 2022: During the court hearing in the case of Ivanova v. Beltz, you discussed my personal and medical information without my consent. I was not a party to this case, was not subpoenaed, and did not authorize the use or disclosure of my protected health information (PHI).

Inclusion in PRE by Dr. Edward Budd: You included my information in the Parental Responsibility Evaluation (PRE) conducted by Dr. Edward C. Budd without my consent. This information was discussed in open court, and I did not sign any consent forms authorizing its disclosure or use.

**Violations of Privacy and Ethical Standards**

Your actions have violated several ethical and legal standards, including but not limited to:

HIPAA Regulations: The unauthorized disclosure of my PHI is a violation of the Health Insurance Portability and Accountability Act (HIPAA).

1

Professional Conduct Rules: As an attorney, you are bound by the rules of professional conduct, which require you to maintain the confidentiality of personal information and to avoid making false statements or unauthorized disclosures.

Invasion of Privacy: Your actions have unlawfully invaded my privacy and caused significant emotional distress.

**Demand for Immediate Action**

I hereby demand that you:

Cease and Desist: Immediately cease and desist from any further unauthorized disclosure and use of my personal and medical information.

Cease Communications with Opposing Counsel: Cease all communications with my opposing counsel regarding my personal and medical information.

Cease Access to My Files: Immediately cease accessing my files in Boulder County Court without my explicit consent.

Corrective Measures: Take immediate corrective measures to ensure that any unauthorized disclosures are retracted and that my information is no longer used or disclosed without my explicit consent.

Written Confirmation: Provide written confirmation within 14 days of receipt of this letter that you have ceased the unauthorized use and disclosure of my information, ceased communications with opposing counsel, ceased accessing my files, and have taken the necessary corrective measures.

**Legal Consequences**

Failure to comply with this cease and desist demand will leave me no choice but to pursue all available legal remedies, including but not limited to filing a complaint with the appropriate professional licensing boards and initiating legal action for damages and injunctive relief. The federal court has proper jurisdiction as the claims involve federal HIPAA violations and constitutional privacy rights. (See 28 U.S.C. § 1331 for federal question jurisdiction.)

**Conclusion**

I trust that you understand the seriousness of this matter and will act accordingly.

Sincerely,

Judi Atwood